EMPRESA ECUATORIANA DE AVIA-CION, S. A., Plaintiff-Appellee, Cross-Appellant,

v.

DISTRICT LODGE NO. 100, et al., De-fendants-Appellants, Cross-Appellees.

No. 80–5349.

United States Court of Appeals, Eleventh Circuit.

Nov. 1, 1982.

Rehearing and Rehearing En Banc Denied Dec. 30, 1982.

---

Manners, Amoon, Whatley & Tucker, Jos. P. Manners, Miami, Fla., Plato E. Papps, Gen. Counsel, IAMAW, Washington, D. C., for defendants-appellants, cross-appellees.

Manas & Marcus, Richard I. Manas, Miami, Fla., Alan Greene, Coconut Grove, Fla., for plaintiff-appellee, cross-appellant. .

Before GODBOLD, Chief Judge, RONEY and WOOD *, Circuit Judges.

GODBOLD, Chief Judge:

This appeal arises from an illegal strike by employees of an airline subject to the Railway Labor Act, 45 U.S.C. § 151 et seq. Without seeking an injunction against the strike the carrier replaced some of the striking workers on the ground that this was necessary for it to continue operating. The airline then sought and obtained injunctive relief ending the strike, and those strikers not replaced were reinstated. The district court held that strikers who had been replaced because of necessity to continue operations were not entitled to reinstatement. It found that four strikers had been replaced unnecessarily and ordered them reinstated but denied them backpay.

The union contends that the district court should have ordered reinstatement to their pre-strike jobs of all persons who had been replaced.

We hold the following. This was a minor dispute under the Act. The district court was not required to order reinstatement of all strikers. Rather it was within the court's equitable discretion to determine whether strikers who had been replaced should be given their jobs back. The district court acted within this discretion in deciding that it was necessary for the carrier to replace strikers in order to continue operations and that properly replaced strikers were not entitled to reinstatement. The district court acted within its authority in deciding on an individual basis which strikers it had been necessary for the carrier to replace; this issue was not as a matter of law reserved to the administrative procedures of the Railway Labor Act. Finally, on the issue of necessity to replace, we review the correctness of the court's findings with respect to individual strikers and also the relief granted those unnecessarily replaced.

I.

The facts of the strike, as found by the district court after extensive evidentiary hearings, are largely undisputed. Empresa Ecuatoriana de Aviacion is an international airline headquartered in Quito, Ecuador, with its primary American operations in Miami and New York. The Miami facility handles a modest amount of passenger and cargo business [1] and employs approximately 70 people. The workers are represented by the International Association of Machinists and Aerospace Workers, District Lodge No. 100. The collective bargaining agreement contains a no-strike clause.

The airline scheduled for April 9, 1979 computer training sessions for employees in the reservation department, and it planned to use the ticket counter computer in the

---

* Honorable Harlington Wood, Jr., U. S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Passenger flights arrive and depart 14 times per week, and three to five cargo flights come in and out per week.

training. During the first week in April union representatives complained, both orally and in a letter, that the airline intended to cross-utilize personnel from the ticket counter and reservation department during the training [2] in violation of the collective bargaining agreement. The letter, delivered April 4, also alleged that the airline had failed to process two grievances and had used management personnel to perform union employees' functions at the airline's New York facility. The union threatened to strike if the training session was held.

Counsel for the airline responded by letter on April 5, stating that the collective bargaining agreement specifically permitted such training sessions and reminding the union that it could invoke grievance machinery to settle this dispute. The letter also assured the union that there would be no cross-utilization of personnel.

The airline's counsel, Greene, planned to vacation in Scotland beginning April 8. He, therefore, drew up contingency plans for use in the event of a strike, one of which consisted of permanently replacing the number of strikers necessary to continue operations.[3] Greene advised the airline that if the strike materialized it should hire replacements, offering them permanent jobs.

On April 6 the union held a meeting to discuss the upcoming training session. Cargo employees who were working overtime were permitted by the cargo manager to attend the meetings. Although union counsel advised the employees at the meeting that they could not strike legally, the chief shop steward disagreed and successfully urged the cargo workers not to return to

work that night. The airline could not get other employees to fill in, so the cargo manager and friends completed unloading cargo.

April 8 the four station agents scheduled to work called in sick. Station agents check in passengers and their luggage, handle the boarding, and generally take care of the needs of the passengers and crew. Management had to service a departing passenger flight because of the agents' absence. Acts of sabotage were encountered: baggage cart tires were flat, a false announcement about the flight's delay was broadcast, harassing phone calls to the airline were received, and ticketing machines malfunctioned.

Later that day management met with union representatives, and it was agreed that there would be no strike the next day, the first day of training. Greene then left on his vacation.

On April 9 employees, including the chief shop steward, showed up for the training session. However, during lunch the steward and other employees urged workers to punch out sick by disseminating a false rumor that three cargo workers had just been fired. Most workers complied.

Although the union did not initiate the walkout it enthusiastically embraced the strike. It rented a hotel room to serve as strike headquarters, applied for picketing permits at the airport, sent a letter to the airline refusing to end the strike until the airline corrected the alleged collective bargaining agreement violations [4] and unsuccessfully encouraged union members in the New York facility to strike, too. At no time did the union tell the carrier when or if the strike would end. On April 9 the

2. The record is unclear whether the union feared cross-utilization would occur only during the training sessions or whether it suspected that the purpose of the training was to facilitate cross-utilization routinely.

3. The distinction between permanent replacement and discharge is often meaningless, but speaking generally, a striking employee does not lose his job under the replacement concept unless and until the employer hires someone else to perform his functions. If the replace-

ment quits before or soon after the strike ends, the replaced employee will be reinstated.

4. The president of District 100 stated that he was afraid to tell the union members to go back to work and that, in a wildcat strike situation, the union normally undertakes negotiations with the company to secure the voluntary return of the members. The president also admitted that he had no intention of disciplining striking members.

airline engaged new counsel, who shared office space with Greene, to begin drawing up a request for a temporary restraining order. The airline began hiring a combination of temporary and permanent replacements the evening of April 9 and continued this on April 10. On April 10 it sent a letter to striking employees telling them that they would be replaced. The same day the carrier fired employee Menoscal on the ground that she had incited other employees to engage in the strike. By April 11 all cargo employees had been replaced.

New workers and the few remaining employees performed under adverse conditions caused by the strikers' conduct.[5] Workers were threatened in person and on the phone with physical violence; one employee avoided assault only by displaying an unloaded gun; one worker's car was covered with acid and its windshield was broken; keys to the company vans, which transport the crew and food, were missing; obscene calls tied up telephone lines; and misinformation that the airline had ceased operations was distributed to travel agencies. These acts of harassment and vandalism caused several replacements to quit and most of the nonstriking employees to join the strike.

In the afternoon of April 11 the airline filed suit asking the court to enjoin the strike and order the employees to return to work. The court conducted an emergency hearing on the evening of April 12 and immediately entered a TRO enjoining the strike, ordering the employees to return to work for their next shifts, and enjoining the carrier from failing to properly process grievances. After this hearing on April 12 the carrier stopped hiring replacements. Striking employees returned to work April 13. Those who had been replaced no longer had jobs. The union then petitioned for relief asking that the court restore the status quo as of the time before replacements were hired, by reinstating all strikers. The court did not grant this relief but scheduled hearings, beginning April 19, to determine

whether replaced employees were entitled to reinstatement. The district court refers to 35 employees, and approximately 40% of the work force, as replaced. The union asserts (although it is unclear as of what time) that the percentage replaced was as high as 65%–70% of the work force. We need not resolve these differences in percentages because it is undisputed that a substantial part of the work force had been replaced by the time the carrier filed its suit and sought a TRO.

After several days of hearings the court held that the airline could replace strikers to the extent reasonably necessary to continue operations. It found that employing necessary replacements satisfied the airline's obligation under the Railway Labor Act to sustain operations without destroying the continuity of the employer-employee relationship, another goal of the Act. The court also held that, to protect the goal of employment continuity, it must pass on the necessity of each replacement and it determined that four replacements had been unnecessary. The court ordered that the four affected strikers be reinstated but declined to award them backpay, citing the illegality of the strike. The court considered backpay to be a type of unjust enrichment under the circumstances.

## II.

The Railway Labor Act, as amended, groups disputes into two categories, major and minor,[6] and prescribes different procedures for their adjustment. The dichotomy between the two categories is based upon differences in the nature of the disagreement, and the procedures applicable to each are adjusted to the nature of each. Conduct or misconduct of the parties, or the impact of misconduct of one party on the other, is not a distinguishing feature between the two channels of dispute resolution provided by the statute.

---

**5.** Management employees too put in long hours substituting for union employees.

**6.** Although the Act itself does not use the major/minor labels, the courts have found the terms expedient.

A major dispute pertains to intended changes in agreements affecting rates of pay, rules or working conditions. "[A major dispute] look[s] to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). The Act provides for notice of an intended change and for maintaining the status quo until the adjustment procedures of the Act—conferences, mediation and intervention by a specially created emergency board—are carried out with respect to the proposal. When either carrier or employee desires to make changes in the agreement respecting pay, rules, or working conditions, it must give 30 days written notice, often called the § 6 notice, 45 U.S.C. § 156, and once notice has been given the employer cannot alter rates of pay, rules or working conditions until 30 days after all adjustment procedures have been exhausted. 45 U.S.C. §§ 155, 156,[7] 160. The employees are under a parallel obligation not to strike.

A minor dispute is not concerned with changes in terms and conditions already agreed upon—that is, elimination of an existing provision or substitution of a new provision for an old one—rather a minor dispute concerns differences over what has previously been agreed upon. In a general sense, a major dispute is about a subject matter that in a non-statutory context would bring about collective bargaining, while a minor dispute involves employee grievances or differing interpretations or applications of the existing collective bargaining agreement. In this case the airline initiated a training session alleged to involve cross-utilization of personnel, it allegedly failed to process grievances, and it is alleged to have used management employees to perform tasks reserved for union employees. All of these are actions taken under, or perhaps contended to be in violation of, the collective bargaining agreement. This is a minor dispute.

The union seeks to bring itself within the major dispute provisions of the Act, contending that this is a major dispute because, first, it involved an effort by the airline to amend the bargaining agreement by adding a right to self-help, and, second, the company violated the status quo provisions of the Act, 45 U.S.C. § 152 Seventh, when it replaced workers. This effort to bootstrap a minor dispute over terms of the bargaining agreement into a major dispute involving proposed changes in the agreement must be rejected. The airline did not assert a right to replace strikers under the agreement, present or prospective, but under principles of self-help extrinsic to the agreement. Accepting the union's contention—that assertions by the airline of a managerial power not included within the bargaining agreement is an effort to amend the agreement to give management that power—would convert many minor disputes into major disputes and alter the basic dichotomy of the Act. As to the status quo provisions of the Act, the statutory freeze of § 152 Seventh flows out of a major dispute and after a § 6 notice has been given. It stands the statutory scheme on its head to assert this section as the basis for a major dispute where no § 6 notice has been given.

We turn then to consideration of this case with its nature as a minor dispute correctly recognized. First, we look at the policy of the Act. As is often stated, the purpose of the Act is to avoid interruption to commerce by providing dispute resolution machinery to prevent strikes. 45 U.S.C. § 151a; remarks of Rep. Barkley of Kentucky, Feb. 24, 1926, reprinted in Legislative History of the Railway Labor Act, As Amended, Subcommittee on Labor of the Senate Committee on Labor and Public Welfare (1974) at 215 ("Legislative History"); *Texas & N. O. R. Co. v. Railway Clerks,* 281 U.S. 548, 568–69, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1929). Emphasis is laid on negotiation and voluntary settlement.

Despite the reluctance of Congress to compel the parties to settle disputes, it

---

**7.** If neither party requests the services of the mediation board within 10 days after conferences have terminated, the parties are no longer required to maintain the status quo.

determined in 1934 that minor disputes should not be permitted to fester until strikes threatened. To this end, it provided for a national board of adjustment and compulsory arbitration.[8] The 1934 amendments to the Act indicate that Congress thought drastic resort to economic self-help was inappropriate to settle minor disputes.[9] A minor dispute must be submitted to compulsory arbitration by an adjustment board, 45 U.S.C. § 153,[10] which has exclusive jurisdiction to decide minor disputes. *Slocum v. Delaware, Lackawanna & Western R. Co.,* 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950). Employees are forbidden to strike over minor disputes, and the federal courts have jurisdiction to enjoin such strikes. *Brotherhood of Railway Trainmen v. Chicago R & I R Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Thus, injunctive relief was available to the airline in this case. There is no statutory requirement that while a minor dispute is being arbitrated the status quo must be maintained; the carrier may act unilaterally until told to do otherwise by the adjustment board's decision. *Brotherhood of Loc. F & E v. Southern Pacific Pac. Co.,* 447 F.2d 1127 (5th Cir. 1979). In this instance, in response to the union's use of self-help in violation of the Act, the airline acted unilaterally by hiring replacements, and then it repaired to the federal court for injunctive relief, which it obtained.

█ As an alternative to the contention, which we have rejected, that this was a major dispute, the union argues that although the specific language of the Act does not require maintenance of the status quo ante in a minor dispute, the policy of the Act does require it. Thus, the union says, since the carrier could obtain injunctive relief that would require the union to restore the status quo by ceasing the strike, the policy of the Act precludes the carrier from employing the self-help of replacement until it has exhausted the injunction route. And, to the extent that the carrier employed replacements before obtaining injunctive relief, all strikers were entitled to return to work in their former jobs.

There are many opposing tensions in this case. The Act does look to settlement of minor disputes by arbitration, and it embraces a strong policy of continuance of employer-employee relationships, although it does not specifically require that the status quo be maintained in a minor dispute. The union has a duty not to strike. The carrier is obligated to supply public transportation and to that end may have to employ replacements to keep service going. The policy of the Act is for negotiation and settlement, as opposed to retaliatory, and often escalating, exercises of economic warfare. The union was subject to injunctive relief that would put the dispute back on the track that Congress had provided and subject also to a possible damage award for violation of the collective bargaining agreement.

There is no contention that the district court erred in enjoining the strike and ordering employees back to work. We cannot say that the court misused the equitable discretion that it possesses in an injunction case by declining to oust all replacements and to order that all strikers have their pre-strike jobs back. The court carefully considered and balanced the competing interests. It held that the carrier was justified in replacing employees as needed in order to continue to meet its cargo and passenger flight schedules, perform its necessary internal business functions, and avoid losing customers and revenue to competitors. It found that the carrier struck a

---

8. Congress found that since the Act's enactment the parties had failed to establish their own boards. Even when operating, the boards often failed to reach decisions because of equal representation by management and labor. Report of Senate Committee on Interstate Commerce on S.3266, May 10, 1934, Legislative History at 820–22.

9. See remarks of Rep. Barkley, Feb. 24, 1926, reprinted in Legislative History at 211.

10. The air transportation industry does not have a national adjustment board; the carriers and union have a duty to establish system, group or regional boards of adjustment. 45 U.S.C. §§ 184, 185.

proper balance between its twin obligations to serve the public and to attempt reasonably to maintain the employer-employee relationship.

Several factors support the court's decision. The airline did not carry out a mass, punitive discharge the moment the strike began. It sought to operate with supervisory employees and their friends, who worked long hours. It hired replacements as and when needed for the tasks at hand. It attempted to persuade some strikers to report to work. Also the carrier acted with reasonable dispatch in seeking injunctive relief; there is no basis for any inference that it delayed going to court in order to get rid of strikers. When the strike was ended by the TRO, strikers who had not been replaced were reinstated, no one was denied reinstatement because of misconduct,[11] strikers replaced were told that if their replacements left or other positions opened up they would be recalled, and pursuant to this promise several strikers were reinstated after April 13.

Several matters, however, deserve comment. First, the district court did not, and we do not, lay down a per se rule that any time a minor dispute is in progress and the union strikes, the carrier may replace strikers before seeking injunctive relief. Rather, in the circumstances of this case, the trial court, in the exercise of its equitable power, required the reinstatement of strikers unnecessarily replaced and declined to require reinstatement of those necessarily replaced, and we find both rulings within its discretion.

Second, the district court considered that the union had behaved badly by availing itself of illegal self-help, and we agree. But we do not, however, base our decision on a concept that the employer was entitled to retaliate because the union threw the first stone, or that the district court should punish the union for bad conduct. Nor do we rely on notions of unclean hands, estoppel or waiver. The central concern of a court must be to weigh the policy of the Act, which is to keep the employer-employee relationship intact, against the policy of the carrier's being able to continue to furnish transportation service by replacing employees to the extent necessary and until the authority of the court can be brought to bear. We cannot say that in analyzing this concern the district court could not, in its discretion, come down as it did.

Third, *National Airlines, Inc. v. International Association of Machinists and Aerospace Workers,* 416 F.2d 998 (5th Cir. 1969), ("*National Airlines I*"), and *Railway Employees v. Florida East Coast R. Co.,* 384 U.S. 238, 245, 86 S.Ct. 1420, 1423, 16 L.Ed.2d 501 (1966), are not controlling of this case. The district court relied upon these cases as the basis for the carrier's right to replace strikers. Though we have sustained a right to replace, it is for different reasons. *National Airlines I* involved a major dispute in which strikers had been enjoined and had refused to obey the injunction. There had been a proper resort to the courts to get the dispute back on the track but without avail. The court held it was not necessary to reinstate strikers who had been replaced. In the present case the right to replace is not drawn from the status quo provisions of the Act, for there are none with respect to minor disputes, nor from the flouting of a court order, which did not occur here, but from the court, in the circumstances of the case, balancing the underlying policy of the Act against the policy of continued carrier service. For the same reasons we reject the union's theory that *National Airline I* stands for the proposition that a carrier may never replace a striker until it has exhausted possibilities of injunctive relief (and possibly even until strikers have disobeyed a court order). *Florida East Coast* also was concerned with a major dispute where, under the statutory scheme, the status quo had been maintained until 30 days after adjustment procedures had been exhausted. The parties then were entitled to avail themselves of self-help. The ameliorative purposes of the Act had been vindi-

---

11. One employee, Menoscal, was discharged for inciting others to strike in violation of the bargaining agreement. This is the subject of an arbitration proceeding.

cated, though without success. The union thereupon resorted to a strike that could not be enjoined and the end of which was impossible to predict. For the same reasons as *National Airline I,* this case does not control the right to replace in the instant case nor support the union's argument that there could be no replacement until injunctive efforts have been exhausted.

## III.

■ Having concluded that the carrier could replace strikers where necessary to its operation, we turn to consideration of the propriety of the individual replacements. Both parties dispute the district court's authority to examine the propriety of each individual replacement. The union argues that if the act of replacement constitutes a minor dispute, the system board of adjustment had exclusive jurisdiction to determine the validity of each replacement, so that each replaced striker should have been permitted to arbitrate the issue of his or her replacement. But the district court's ability to determine the issues of reinstatement and backpay is inherent in its power to issue injunctive relief. Unquestionably the adjustment board has exclusive jurisdiction to decide the underlying minor dispute about cross-utilization of personnel. But when the parties jump the track and one side seeks injunctive relief, the district court may, in its discretion, decide all corollary issues concerning the status quo. *Brotherhood of Locomotive Engrs. v. Missouri-Kansas Texas R. R.,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960). *See United Industrial Workers of Seafarers Int'l Union v. Bd. of Trustees of Galveston Wharves,* 400 F.2d 320, 324–27 (5th Cir. 1968) for a similar discussion of the court's authority to decide reinstatement and backpay issues in a major dispute case.

The airline contends that once the district court confirmed the company's right to replace and found that the airline had acted without union animus, the court exceeded its authority by testing the necessity of each replacement; instead the court should have deferred to the business judgment of the airline managers who made quick decisions under duress on which replacements were necessary to continue operations. We have recognized that, under the circumstances, the employer could balance the necessity of remaining operational against the policy of maintaining employment relationships, but this does not mean that its decisions are beyond judicial review.

The district court's meticulous fact finding of the conditions surrounding each replacement insured preservation of the delicate balance between the two goals of the Act, continuity of the employer-employee relationship and uninterrupted service. The court did not abuse its discretion by scrutinizing each replacement. *National Airlines, Inc. v. Int'l Assn. of Machinists and Aerospace Workers,* 430 F.2d 957 (5th Cir. 1970) ("National Airlines II") does not dictate a contrary holding.[12]

We have reviewed under the clearly erroneous standard the district court's findings concerning the necessity of each replacement. We find no clear error in the findings with respect to any employee whose replacement was held to be necessary. Four strikers, Sosa, Ferrer, Montessinos and Rodriguez, were held unnecessarily replaced. Sosa, Ferrer and Montessinos were offered reinstatement; Montessinos accepted, and the other two refused. The claims of these three for reinstatement are thus moot, and the airline has eschewed review of the necessity-of-replacement issue with respect to them.

12. On remand from *National Airlines I,* the district court determined that it had been reasonably necessary for the airline to discharge all strikers in order to continue operations. In *National Airlines II* we reiterated our previous holding that replacement was the outer limit of permissible self-help and that all strikers who had not been replaced by the time the strike would have ended but for the discharges were entitled to reinstatement. We directed the district court to determine who had been replaced as of that date and to reinstate the rest. The district judge in *National Airlines* had found it unnecessary to closely examine each replacement because he thought the mass discharge was sustainable.

Rodriguez worked in the sales office as one of two sales representatives. He and employee Baca divided territory geographically and each was responsible for half of the total. When the strike began false information was disseminated that the airline was cancelling all flights, and sales representatives' most important duty became to contact travel agents and answer phones to assure customers that the airline was still operating.

Rodriguez joined the strike on Monday. On Tuesday afternoon management decided that he should be replaced. A potential replacement was interviewed either that afternoon or the next day and was put to work on Wednesday. Meanwhile Baca, the second sales representative, received a telephone call Tuesday afternoon in which the caller threatened him with physical harm. Because Baca was elderly and nervous management permitted him to go home a few minutes early. Management did not know that he would not return to work. However, on Wednesday Baca did not come in for work; instead he joined the strike. Thus, Rodriguez's replacement was authorized by management because it thought two employees were needed in the sales office. Hiring of the replacement was unrelated to Baca's joining the strike. The district court found that the airline could have operated the sales office with one person, so that it was not reasonably necessary to replace Rodriguez. We cannot say that this determination is plainly erroneous.

The district court declined to award backpay to any striker who had been unnecessarily replaced on the ground that this would unjustly enrich him. We hold this was error. We have already discussed the court's equitable discretion and the balancing of interests. Once these processes were exhausted and it was determined that there were persons who had been unnecessarily replaced and therefore were entitled to reinstatement, these persons were also entitled to the remedies that normally accompany reinstatement. Backpay is not intended as punishment for the carrier or a windfall to the employees but is "the price of reconstructing the status quo." *United Industrial Workers of the Seafarers Int'l Union v. Bd. of Trustees of Galveston Wharves,* 400 F.2d 320, 325 (5th Cir. 1968). Nor should backpay be denied as a means of disciplining erring strikers. In *National Airlines II* we held that wildcat strikers who had been fired while freeze provisions of the Act were in effect were entitled to reinstatement with full benefits including backpay. The wrong of the strikers was not indicated to be a bar, and in ordering a remedy we did not engage in a new balancing of striker misconduct versus employer misconduct. Again, a court must keep central to its consideration the national policies underlying the Railway Labor Act and not individual feelings of judges about who has and who has not behaved badly. Thus, Rodriguez is entitled to reinstatement with backpay and other benefits from the date he came off strike to the date he is offered reinstatement, reduced by any earnings during the period for which he is entitled to backpay. Sosa, Ferrer and Montessinos are entitled to backpay and other benefits from the date each came off strike to the date the airline offered to reinstate him or her, reduced by any earnings during the backpay period.

The district court did not address the union's request for a preferential hiring list of those necessarily replaced but entitled to reinstatement when vacancies occur. The strikers who were properly replaced are entitled to be placed on such a list, to be rehired when their replacements quit or when a similar vacancy arises. Without this hiring preference the concept of replacement becomes indistinguishable from discharge. The district court should work out the details of the preferential hiring list, including the duration of the list, if the parties cannot agree among themselves.

In the union's appeal, we REVERSE on the issue of the entitlement of unnecessarily replaced strikers to backpay and the requirement of a preferential hiring list and AFFIRM on all other issues; on the airline's cross-appeal we AFFIRM on all issues. The case is REMANDED for further proceedings.