AIR LINE PILOTS ASSOCIATION
INTERNATIONAL, Plaintiff,

v.

UNITED AIR LINES, INC., Defendant.

No. 85 C 4765.

United States District Court,
N.D. Illinois, E.D.

Aug. 1, 1985.

Michael E. Abram, Jay P. Levy-Warren, Christopher N. Souris, Cohen, Weiss & Simon, New York City, Harold Katz, Michael B. Erp, Katz, Friedman, Schur & Eagle, Chicago, Ill., for plaintiff.

Joel H. Kaplan, Valerie J. Hoffman, Gary S. Kaplan, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Stephen P. Sawyer, Kathleen K. Intini, N. Morrison Torrey, Robert P. Casey, United Air Lines, Inc., Elk Grove Township, Ill., for defendant.

## MEMORANDUM ORDER

BUA, District Judge.

The above-captioned matter came before the Court for trial on the merits of plaintiff's complaint. The Court, having heard testimony June 17 through June 28, 1985, and having reviewed deposition designations, exhibits and memoranda submitted by the parties, does hereby enter the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT

1. This action was filed on May 16, 1985 by plaintiff Air Line Pilots Association, International ("ALPA") against defendant

United Air Lines, Inc. ("United"). The complaint alleged that United had violated or was about to violate several provisions of the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.* ("the RLA"). These allegations related to alleged acts of United during the time that ALPA and United were in the process of collective bargaining negotiations for a new agreement to replace the parties' agreement negotiated in 1981 ("the 1981 Agreement"). The allegations also related to plans which United had announced it intended to carry out if there were a strike by the pilots. On May 17, 1985, at 12:01 a.m. (E.D.T.), United's pilots commenced a strike against United.

2. On May 17, ALPA filed motions for preliminary injunction and for expedited discovery. The Court granted ALPA's discovery motion, also requiring that ALPA submit to expedited discovery by United. The Court scheduled a hearing on ALPA's motion for preliminary injunction for June 10, 1985. Subsequently, the hearing was rescheduled to June 17, 1985.

3. On May 28, 1985, United filed a motion to strike ALPA's claim for injunctive relief. United asserted that ALPA was not entitled to injunctive relief under section 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, because ALPA had failed to accept the proffer of arbitration by the National Mediation Board ("NMB") on April 16, 1985, after United had rejected the proffer. On June 7, 1985, the Court denied United's motion. *See* Memorandum Order, June 7, 1985, 610 F.Supp. 243.

4. On June 14, 1985, the United Air Lines Master Executive Council ("UAL–MEC") for the United pilots ratified a tentative agreement that had been reached between the negotiating committees for United and ALPA, thus ending the strike. The back-to-work agreement, which was ratified together with the basic economic agreement, provided in part:

> The Association and the Company agree that neither will engage in or condone any activities which might constitute reprisals or recriminations as a result of the ALPA strike. The Company will withdraw all Letters of Charge and all disciplinary actions taken against pilots for strike-related activities and will not take any further action against ALPA or pilots for strike-related activities. ALPA agrees not to level fines or take other disciplinary action against nonstriking pilots. *ALPA's claims regarding the "500" pilots, system rebid and salaries for pilots hired as "fleet qualified" will continue to be pursued by ALPA in Federal Court.* The parties agree to a plenary trial commencing June 13, 1985. Should there be any appeals both parties will agree to an expedited appeal. The parties will drop all other strike related litigation or arbitration.

Pl.Ex. 43 at ¶ 14 (emphasis added).

### A. *The Parties*

5. ALPA is an unincorporated labor organization and is the duly certified exclusive collective bargaining representative under the RLA, for the air line pilots employed by United. Stipulation of Uncontested Facts ("Stipulation") at ¶ 1. Henry A. Duffy is the President of ALPA.

6. Representation of United pilots is controlled by the UAL–MEC which consists of three elected members from each of the nine pilot domiciles. Tr. 1253. Roger Hall is the Chief Executive Officer of UAL–MEC. UAL–MEC's chief negotiator is William C. Brashear, and the Chairman of ALPA's United Pilots Strike Committee is Frederick C. Dubinsky.

7. United is a corporation duly organized and existing under the laws of the State of Delaware, having an office and place of business in the Township of Elk Grove, Cook County, Illinois. United is an air carrier as defined in the Federal Aviation Act of 1958, as amended (49 U.S.C. §§ 1301–1542), holding certificates of public convenience and necessity issued pursuant to that Act, under which certificates it operates an airline system for the carriage by air of passengers, property and mail in domestic, overseas and foreign commerce. As such, United is a "carrier" as defined by

45 U.S.C. § 181, and is subject to the provisions thereof. Stipulation at ¶ 2.

8. United's Chairman and Chief Executive Officer is Richard J. Ferris and its President is James J. Hartigan. United's chief negotiator is David Pringle, and James Guyette is Chairman of United's Operations Adjustment Task Force. Lloyd W. Barry is Senior Vice President of Flight Operations.

9. United's airline system is the largest domestic carrier in the United States. United serves more than 150 cities in the United States, including Chicago, and approximately 10 cities in 5 foreign countries and territories, and has operating routes extending over approximately 500,000 route miles. United has a fleet of over 300 aircraft owned and leased. Stipulation at ¶s 3–4.

10. In its air transport operation, United employs over 48,000 persons. Among these are some 9,000 persons employed in the craft or class of flight attendants represented for the purpose of collective bargaining under the RLA by the Association of Flight Attendants ("AFA") and approximately 15,000 persons employed in various crafts and classes represented by District 141, International Association of Machinists and Aerospace Workers ("IAM"). United, AFA and IAM are currently parties to existing collective bargaining agreements. Stipulation at ¶ 4.

B. *Events Preceding the Strike*

11. For many years ALPA and United have been parties to successive collective bargaining agreements. The agreement in effect prior to the strike had been in effect since October 1981 and contained the following duration clause:

This Agreement shall continue in full force and effect until October 1, 1983 and shall renew itself without change each succeeding October 1 thereafter, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended, by either party at least sixty (60) days prior to October 1, 1983 or any year thereafter upon written notice of either party thereto.

Pl.Ex. 1, Section 22 at ¶ C. The parties later extended the October 1, 1983 date to April 1, 1984 by agreement.

12. On January 30, 1984, United served an opening letter under Section 6 of the RLA upon ALPA. Tr. 948; Def.Ex. 146. In turn, ALPA served its own Section 6 Notice upon United stating its various proposals for modifications to the 1981 Agreement. Tr. 955; Def.Ex. 145. Issues signaled for negotiation included, *inter alia,* compensation for incumbents, new-hire rates and the method for assigning cockpit seats to pilots. Def.Exs. 145 and 146. These proposals are known as "Section 6 Openers" in that they commenced the process for amendment of the 1981 Agreement provided in Section 6 of the RLA, 45 U.S.C. § 156.

13. Prior to the Airline Deregulation Act, P.L. 95–504, 92 Stat. 1705, the commercial airline industry was regulated as to its route structure, rates it could charge passengers, and the like. During the regulated era, United (and other trunk carriers) had little economic incentive to seek to contain pilot labor costs.

14. As negotiations progressed during 1984, it became clear to the parties that the most difficult issue before them was United's request that ALPA agree to a new, reduced pay scale to apply to pilots hired during the term of the potential new agreement. This pay scale issue has been referred to as the "new-hire pay scale." United's objective in its negotiations with ALPA was to secure what was, in United's judgment, a "cost competitive" agreement with ALPA. Tr. 442–43. United was concerned that its competitors, especially American Air Lines, benefitted from lower pilot costs. Tr. 946; 1012. Although United made an operating profit of more than $500 million in 1984 (Tr. 508), it had incurred operating losses for the previous five years. Tr. 1015; Def.Ex. 146.

15. In August 1984, mediators from the NMB entered the collective bargaining negotiations. Tr. 962.

### 1. *Task Force Created*

16. In the fall of 1984, United began to plan for the possibility of a strike by the pilots. United created a task force to develop a plan to operate in the event of a pilots' strike. The flight operations aspect of the planning was committed to the direction of Captain Lloyd Barry, who had become Senior Vice President of Flight Operations in March 1984. Tr. 234, 299, 380. Barry was assisted by Rakesh Gangwald, a systems analyst who was brought in to aid Barry in developing administrative business processes for flight operations. Tr. 376.

17. United's flight operations strike plan was called the "operations adjustment plan." Pl.Ex. 22; Tr. 301. United was aware that its operations adjustment plan might not create enough pressure to force ALPA to settle on United's terms prior to May 17. United believed that, if a strike took place, the plan would break the strike, and thereby force ALPA to settle on terms preferred by United. Tr. 302–4. The breaking of the strike and forcing of a settlement was the objective of United's flight operations adjustment plan. *Id.;* Tr. 343. The elements of this plan were regarded by United as so "stern or unusual" (Tr. 534) that, if a strike occurred, there would be a "stampede" of pilots to the United side. Tr. 464. United believed that it could break the strike in two to four days. Tr. 302–3; Pl.Ex. 22. Ferris believed that United would secure its objective:

> You know what's going to happen, if we have this withdrawal of service, what's going to happen is eventually the membership is going to be fed up enough— it's the old story, throw the rascals out, put a new one in; we negotiate to come back on the property.

Tr. 470, Videotape of O'Hare Domicile Meeting, May 2, 1985.

### 2. *The "Group of 500"*

18. Also in the fall of 1984, United began to experience a shortage of pilots for its desired flight schedule. Tr. 41, 1011.

19. Prior to the fall of 1984, United last hired new pilots during the period between 1977–79. Stipulation at ¶ 33; Tr. 102. Approximately 800 pilots were hired in that time. Tr. 34. Those individuals were brought into United in order to serve in the entry-level position of second officers. Stipulation at ¶ 33; Tr. 34, 38, 41.

20. Prior to the fall of 1984, United's practice was to employ student pilots from the first day of training. Stipulation at ¶ 33; Tr. 40, 337–38. Training of student pilots was conducted in accordance with rules in the 1981 Agreement, whether or not the student pilots were being trained with incumbent pilots. Tr. 104, 143. Student pilots were paid at rates established in the 1981 Agreement. Tr. 339. Pursuant to the 1981 Agreement, the student pilots accrued pilot seniority from their first date of hire as student pilots. Pl.Ex. 1, Sec. 6(A)(1), p. 35.

21. During United's hiring of student pilots in the period 1977 to 1979, when Initial Operating Experience ("IOE") was a domicile activity, student flight officers were: (1) provided tentative pilot seniority numbers on their first or second day of training at Denver, conditioned upon the successful completion of training and receipt of an assignment to the line for second officer duty; (2) assigned to the line for second officer duty upon completion of the Denver training program; (3) provided final seniority numbers at the time of their completion of training and assignment to the line for second officer duty; and (4) had their IOE at their assigned domicile subsequent to the above stated events. Tr. 731. In 1978–79, individuals hired for student pilot positions became line pilots with final seniority numbers on the United pilot system seniority list upon the completion of training and prior to beginning IOE. Tr. 630–631, 646, 731; Pl.Ex. 47. Less than 1% of pilots who completed their training in 1977–79 failed to complete their IOE. Court Ex. 1 at ¶ 45.

22. During the fall of 1984, while United was negotiating with ALPA as to the new-hire pay scale, United did not want the

new hires "on the property" while the negotiations were in progress because, in its view, that would make it more difficult for ALPA to agree to a reduced new-hire scale. Tr. 340–41. In addition, United did not wish to pay new hires at the incumbent rates provided in the 1981 Agreement. Tr. 42, 339. Accordingly, United decided that it would "pretrain" several hundred "applicants," who would be offered "formal employment" once United had secured a cost competitive agreement with ALPA. Tr. 45, 112, 231, 340, 484, 1122–23. During this time, United was unable to expand and lost market share. Tr. 484–85.

23. Beginning in November of 1984, United interviewed and selected approximately 600 candidates for its training program. Tr. 45 ("the Group of 500" or "student pilots"). Approximately 8 applicants were screened for each of the student pilots selected. Tr. 113. A "considerable amount of money" was spent to conduct the selection, which included interviews, psychological testing, and evaluation at the controls of United's aircraft cockpit simulators in Denver. Tr. 43–44.

24. As the student pilots were selected for United training, they were required to execute a form described as a "Flight Officer Training Agreement." *E.g.* Def.Ex. 140. In the forms, the student pilot agreed that he or she would receive United flight officer training "without charge for tuition" and would receive "$30 per day for expenses for the duration of my training period." The student pilot further was required to agree that "[d]uring this training, I understand that I will not be an employee of United Airlines and will receive no compensation from United other than expense money." The agreement further provided:

> I understand that graduates of Flight Officer Training will constitute a pool of trained candidates for Flight Officer employment, which United Airlines may employ, if needed, within twelve months of graduation. I understand that in order to be offered such employment, that I must continue to meet the requirements

and qualifications for the flight officer position.

It was also agreed that United could terminate the training or employment without notice or liability. Def.Ex. 140. The student pilots were expected to provide their own lodging and meals out of their expense money. Pl.Ex. 5 at p. 4. United informed the Group of 500 that they would be offered employment by class date (the date their initial training commenced). Tr. 155, 199.

25. The training consisted of initial training and four to five days of refresher training. Court Ex. 1 at ¶ 44. As they were selected, the student pilots entered a three-week second officer training program at United's Denver Training Center. They were trained on a schedule determined by United which resulted in a more condensed training period than was customary at United in the past. Tr. 136. During their initial training, the student pilots were measured for their uniforms, which were later ordered for them approximately a month before May 17, 1985. Tr. 109. United generated a list of tentative seniority numbers for the student pilots, ranked in order of their class dates, and, within the classes, their Social Security numbers. Court Ex. 1 at ¶ 43.2; Pl.Ex. 90. It was United's intent that the student pilots "accepting employment when offered will receive a short refresher course and IOE [initial operating experience]." Pl.Ex. 5 at p. 3. Training, however, would be complete upon conclusion of the refresher course, prior to IOE. Court Ex. 1 at ¶ 44. This break in training, resulting in use of a short refresher course, and the fact that the training course took less time than in the past, were additional differences from United's previous training program for new hires. Tr. 135, 137.

26. Only 2% of the total number of student pilots failed to complete initial training. Tr. 120. Upon completion of their initial training, the Group of 500 was provisionally qualified to serve as United second officers, lacking only their IOE to become

fully qualified to engage in line flying. Pl.Ex. 42; Tr. 159.

27. On about April 20, 1985, United offered second officer employment to approximately 375 members of the Group of 500 who had successfully completed initial training. Tr. 48, 49; Pl.Ex. 8. The offers were effective May 17, 1985, whether or not there was a strike, at $1,800 per month for 81 hours, and stated that the four-day refresher course would start as early as May 3, 1985. Stipulation at ¶ 38; Tr. 48, 49; Pl.Ex. 8. In order to accept United's offer, the recipient was required to respond by telephone no later than April 24, 1985. Pl.Ex. 8. Approximately 325 of the recipients accepted and were scheduled for their refresher courses to commence at various dates commencing May 3, 1985. Tr. 50, 149; Pl.Ex. 9 (as modified by Def.Ex. 79A). The student pilots then received a mailing from United's Director of Flight Standards and Training, William Traub, stating that "I am sure you are looking forward to beginning your career as a United Airlines Second Officer as much as we are." Pl.Ex. 6. Traub enclosed with the letter a package of home study material to be completed prior to refresher training and several written tests. The letter advised the recipient that his change to "permanent status will occur on May 17, 1985 or on the day you enter training whichever is later." *Id.* at p. 2.

28. In addition to the Traub letter, the student pilots who accepted United's April 20 offer were sent a further confirming letter by the Manager of Flight Employment, Raymond Boyle. *E.g.*, Pl.Ex. 12; Tr. 51–52. The letter confirmed that employment would be effective May 17, 1985, specified a date for resumption of training prior to May 17, and requested that the recipient report on the date training would resume. Pl.Ex. 12; Tr. 50–52. The recipient was also requested to complete a package of employment forms which were enclosed with the letter. Pl.Ex. 12; Tr. 52.

29. Most of the Group of 500 were given employment dates of May 17, 1985. Tr. 47. Some of the Group of 500 who were offered jobs in United's mailgrams (Pl.Ex. 8) were initially scheduled for refresher training to begin after May 17, 1985. Believing that the later starting dates might create seniority conflicts, United sent another mailgram on May 4 to the small group of student pilots whose refresher and training had been scheduled after May 17. Def.Ex. 76, This mailgram, unlike Pl.Ex. 8, specifically required that "[t]o accept our offer, you must be able to report to work in Denver on May 17." Def.Ex. 76.

30. As the strike deadline of May 17 approached, United addressed a letter to the Group of 500 specifically requesting that they report "at 0800 hours" to the Denver Flight Training Center on May 17. Def.Ex. 77. The letter, however, was mailed after prior offers had been accepted. Pl.Ex. 6, 12, 9. The letter was to "make it absolutely clear everybody got the same message and would be reporting at the same place." Tr. 92.

31. When United first offered employment to the Group of 500, it did not hire them to serve as "crossovers" in a pilot strike. Tr. 50. For example, Brent Barrett, one of the Group of 500, was told by United, when offered employment on April 20, that "it is up to you" whether he honored a picket line in the event of a strike. Tr. 204. Barrett was previously told that United did not want to put the new-hire pool on the line until it "had a contract" with ALPA. Tr. 231. Daniel Petrovich, another member of the Group, had been told by United that he would not be asked to "cross the picket line." Tr. 158.

32. As the May 17 strike deadline approached, however, United began to view the Group of 500 as a pool of trained replacements for striking pilots. Thus, United told the Group that if they did not work on May 17, they would not work for United in the future. Tr. 342, 170. United officials also told members of the Group that Ferris had already decided that they would "never work for United Air Lines if we didn't show up on the 17th" of May. Tr. 210. They were told that "if they don't

cross the picket line and go to work on the 17th, you will never work for United Air Lines." Tr. 171. Some of the Group of 500 were told that if they did "take the job," complete their training and then join the strike, they "would not make it through their probation year" as pilots. Tr. 168–69. Prior to the strike, Ferris personally told United's TCAs in Denver,

> We have got 500 pre-hires, right? Those pre-hires are all going, they've been given notice, and come 0001 May 17, they're employed, boom. If they don't show up to work, they will never, ever, work for this air line, ever, because they're not on the property, they won't have a number, they don't have anything.

Tr. 728.

33. As of May 17, 1985, under this training program, approximately 600 individuals were selected for training by United. Tr. 35, 135–36, 365. United issued seniority numbers, however, only to those of the Group of 500 who reported to work on May 17, 1985 and who were put on the company payroll at that time. Such seniority numbers did not become final until the student pilot received an assignment to a line position. Court Ex. 1, at ¶ 43(2).

34. Also as of May 17, 1985, approximately 150 of the Group of 500 had completed their refresher training and 10 to 12 had completed their IOE. *Id.* at ¶ 44. United did not assign any member of the Group of 500 to the line, or provide them with final seniority numbers prior to May 17, 1985, whether or not they completed their initial training, whether or not they completed their refresher training, or whether or not they completed their IOE. *Id.* at ¶ 43(3).

35. On May 17, with the strike in progress, few of the Group of 500 crossed the ALPA picket lines. The striking Group members testified that they physically approached the training facility on the morning of May 17, encountered the ALPA picket line, declined to cross, and signed a report form provided by ALPA which was subsequently supplied to United. Pl.Ex. 38; Tr. 175–76, 214, 1473.

36. At 0001 EDT May 17, 1985, some of the Group of 500 were undergoing United training in the Avia training facility in Long Beach, California. When these pilots learned from management that the strike had occurred and a picket line had been established, they departed the training facility. Tr. 174. Daniel Petrovich was told at that time by his Training Check Airman, John Jacobs, that United President James Hartigan had just told him that the strike was in progress and that if the trainees left the Avia facility "they would all be terminated." Tr. 173.

37. Paula Wenz, another member of the Group of 500 who refused to cross the picket line, testified that TCA Brown told her and others on May 6 that

> if on May 17th we didn't cross the picket line, that we would never work for United Air Lines again, and he said if by some reason we were included into a back-to-work agreement or whatever, he would personally see to it that we would never make it through our probationary year.

Tr. 1472. Wenz had never previously been told that she would have to cross a picket line in order to become a United pilot. *Id.*

38. Under the ALPA Constitution and By-Laws, a member may be expelled for "[p]erforming work for or assisting an airline during a period when the members of this Association are on strike against such airline." Def.Ex. 170, Art. VIII, Sec. 1(A)(5). Applicants who have been "involved in alleged strikebreaking shall not be accepted for membership" except in accordance with rigorous procedures. *Id.*, Art. II, Sec. 10(B). Barry, as a former ALPA representative (Tr. 235), knew or should have known that requiring the Group of 500 to serve as crossovers could materially jeopardize their opportunity to become members of ALPA at United or elsewhere.

39. United's policy continues to be that the Group of 500 who did not report to work on May 17, 1985 will not become employees of United. Tr. 451, 1165–66.

### 3. *The Parties' Prestrike Communications to Pilots and Student Pilots*

40. By April 16, 1985, United's planning for the flight operations aspect of a strike had been thoroughly developed, and United decided to engage in an extensive program to communicate certain aspects of the plan to the pilot group. The communications program was briefly summarized in a slide presentation that Barry gave to an assembly of United's corporate officers on April 23, 1985. Pl.Ex. 22. It included: "informational letters/bulletins as needed," "selective canvassing of influential pilots" and "road shows" conducted by Ferris and Barry. The road shows were meetings of pilots at the various domiciles, where Ferris and Barry would discuss United's position in the negotiations and United's plans for actions which would affect pilots in a strike. Barry testified that one purpose of these road shows was as follows:

> We hoped that might result in individual pilots that were informed and aware of the situation, would influence a settlement, if you will, to try to go back to the ALPA negotiating committee and the MEC and influence them to come to some sort of an agreement with the company.

Tr. 533. Barry further testified that another purpose of the road shows was:

> There was another purpose that we knew that if the pilots struck the company, we were going to have to do some things that were—I will say—rather stern or unusual, and we wanted to make absolutely sure that the pilots understood this and could perceive our resolve in going ahead and accomplishing what we had to do.

Tr. 534.

41. During the 30-day period immediately preceding the strike, United communicated its plans for the pilots through letters and road shows. Although the road shows were sparsely attended, United mailed to all pilots a videotape cassette of excerpts of the May 2, 1985 road show for pilots domiciled at O'Hare. United communicated the following points to the pilots as part of its effort to bring pressure to bear on the ALPA negotiators:

a. On April 24, Barry sent a letter to all pilots. Pl.Ex. 15. He stated, "if a pilot strike occurs, United will continue to operate. Flight operations will change and opportunities for bidding may open up dramatically." The letter offered pilots a chance to take training so that they could qualify to bid for captains' jobs in the event of a strike.

b. Barry's April 24 letter also stated that United would hire "permanent replacements for striking pilots." If already qualified to serve as captains or first officers, they would be paid $75,000 or $50,000 per year, respectively, and would be "pay protected" at those rates "even though they may be later reassigned to lower positions."

c. Barry's letter added, "THIS COMPANY INTENDS TO REWARD THE LOYALTY OF THOSE PILOTS WHO HELP US KEEP THIS AIRLINE RUNNING."

d. On May 3, Barry sent another letter to the pilots. Pl.Ex. 16. He stated that striking pilots who reach their retirement date would be ineligible to receive, during their retirement, nonpension retirement benefits such as passes and insurance; that striking pilots who wished to be covered by insurance would have to convert to an "expensive" policy which is "not nearly as comprehensive;" that "striking pilots do not accrue seniority during the period of the strike;" and that "[s]trikers will be ineligible to receive or continue to receive sick leave pay." Finally, Barry stated the following:

> BACK TO WORK AGREEMENT—We will not agree to a back to work agreement which adversely impacts nonstriking pilots or new hire pilots. In fact there is no legal obligation to agree to any back to work agreement. Contrary to what you may have heard, ALPA cannot guarantee that anything will be included in a back to work agreement. We want you to be aware of these policies so that you will recognize how your decision on a work stoppage will affect

the benefits you and your family now enjoy. We will hire and train pilots to replace those who elect not to continue working. These new pilots will be given a seniority number and will be *permanent* replacements. When and if the strike ends, those who participate in the work stoppage will be able to return *only* to fill vacancies for which they are immediately qualified. Recall will be based on qualification to perform available work, not seniority, and it could be several years, if ever, before striking pilots are returned.

Pl.Ex. 16, pp. 4–5 (emphasis in original).

e. On May 9, 1985, Barry again wrote the pilots to discuss United's plan to "rebid" the airline if a strike occurs. Pl.Ex. 17. He stated in part:

Only those pilots who accept and perform their first and subsequent duty assignments will be eligible to bid. The first round of bids will be closed as soon as each pilot who maintains continuous service has had an opportunity to bid. Any pilot who has been awarded a bid under this process who subsequently strikes will forfeit his bid.

You will be eligible to be awarded any vacancy, notwithstanding any current freezes which may have been applicable under the 1981 Agreement. However, in order to be awarded a Captain bid you must have completed the written portion of the ATP.

We will utilize you in your current assignment, unless you can be more productive to the recovery of the airline by being trained into another position. In some cases this may mean a PC in your old equipment. In others it may mean a rating or upgrading in the aircraft you now fly. Ultimately, unless the assignment (domicile, equipment and status) has ceased to exist, you will be trained and activated into your newly awarded assignment. In the meantime, you will be paid the greater of the following: (1) your current assignment, (2) any other position we have assigned you to, or (3) your newly awarded bid, if, on a one-for-

one basis, a more junior pilot is functioning in your stead. If your service is continuous, we will continue your monthly salary and, also, pay you for any actual hours flown over 81:00.

f. On May 13, 1985, Pringle wrote to the United pilots, setting forth the terms which United intended to implement on May 17 if a strike occurred. Pl.Ex. 18. The terms included a pay raise for all incumbent pilots. Pringle stated:

Contrary to the misleading information you have received from ALPA, they cannot guarantee any striking pilot will ever be returned. Nor can they promise any striking pilot will not be seriously disadvantaged by the rebidding process which will occur soon after May 17. Nor can ALPA represent there will not be substantial losses in pension and medical benefits for striking pilots.

Pl.Ex. 18. In sending this letter United hoped to encourage pilots not to strike and to influence a settlement. Tr. 969. United also hoped that the proposed pay increase for incumbents would lead pilots to decide against going on strike. Tr. 1044–45.

g. At the O'Hare domicile road show of May 2, 1985, Barry further discussed the planned rebidding of the airline. He stated in part:

We're going to have to run it on a business basis and to do so, we're going to take some actions. We are going to rebid the airline. I have heard screams— you can't do that. Yes we can and we're going to. We're going to rebid it; we're going to rebid it rapidly. The people that are here on the property are going to be eligible to bid this thing and that those who aren't on the property, are not going to be eligible to rebid. Now what does that mean to you. Obviously, if there are bids posted up there when we won the award procedure, there are some people that are going to be out of seniority receive some bids. We won't be able to train them overnight or instantly because we're going to have to run the airline— but I can assure you, that those bids will be honored before we ever award any

other vacancies and retrain. They will be honored. We may use them in this emergency period in a different posture and in a different position—we will salary protect them and we will train them when we get this airline back to normal.

Pl.Ex. 53.

h. Ferris also discussed the rebid at the same meeting. He stated:

But let's assume ... that 200 guys come back and they are all spread through the seniority list, all right? The day we rebid this air line, if they are the ones on the property, ... they can bid. You know, if there are only 200 747 captain vacancies, that's what they're going to bid. If they bid that, and they get it, that's theirs, period, never to be released. I'll tell you what, that's powerful inducement, powerful inducement. But, again, I hope that that inducement, you know, isn't what we have to use.

Tr. 469–70.

i. Ferris also discussed the rebid in a meeting with United's training check airmen ("TCAs") in Denver during the cooling-off period. He stated:

Ferris: What we are going to do is that in about another three, four days, a letter will go out to all pilots, setting forth exactly in black and white the conditions which existing pilots will come to work for this air line, if they elect to work and not withhold services, all right, very clear, and about 24 hours prior to, not "about," it will be, we start on the phones.

And we're going to tell everybody ahead of time, "get the word out, you better be available to answer the phone," because if they don't, we're going to presume they've elected not to return. We're going to call on the phone and say, "Tomorrow we want you here, at this time, at this hour, here. Are you going to [be] there or are you not?"

The individual is going to have to answer that question. If they say they're going to be there, we'll respect that. If they say they're not going to be there, I will respect that. Then within 24 hours ...

we're not all positive on this yet, depending on how many come, et cetera, we will operate as much of the air line as we can, put that schedule in place, and then, probably, within 24 to 48 hours, we will rebid the air line. So penalty and harm and hurt will begin within 24 hours. (Laughter)

We're not playing around. You will be here to work. You don't show up to work, the harm will hit, and the union will never negotiate that away. Oh, yes, I'll go to the negotiating table, but I don't have to, to give anything away I don't want to give away. And in a back-to-work agreement, when we rebid the air line that's it, it sticks. Does that answer ...? (Laughter)

Voice: Yes, pretty much. (Laughter)

Ferris: You know, what it gets down to, you know, I get a kick out of some of the groups I talk to. It's like they can play hardball and withhold their service and shut down this air line, but I'm supposed to stand here and be a nice guy. Bullshit. I'm going to play tough.

Tr. 726–27.

j. Ferris also discussed United's plans for hiring pilots in the TCA meeting. He stated:

We have got 500 pre-hires, right? Those pre-hires are all going, they've been given notice, and come 0001 May 17, they're employed, boom. If they don't show up to work, they will never, ever work for this air line, ever, because they're not on the property, they don't have a number, they don't have anything. So 001, these 500 show up to work, okay?

\* \* \* \* \* \*

And in another two weeks, another 300 right behind them are going to give up their jobs. Guess what? We are going to have on this property 900 employees roughly that we've never seen before. And if you're a second officer, and you elect to withhold your services, I doubt that you'll see this air line again for 20

years. So when you want to play the game, you better know how you are going to play it.

I will never forsake anybody that comes to work. I will never forsake their seniority. I will never negotiate it away. All right? If they want to play hard, let's play. But know what game you're getting.... The sad part about this, these guys marching up and down the roads like dummies, they don't know what they're into. They don't know the rules. They think it's sweetness and light. And that's sad.

Tr. 728–29.

42. When ALPA learned that United intended to use the Group of 500 as replacements during a strike, Hall sent a letter to the Group of 500 encouraging them not to cross the picket line. Tr. 741–42; Def.Ex. 81. The student pilots also received a report from the Future Aviation Professionals Association, commissioned by ALPA, informing them about the labor dispute at United. Def.Ex. 152; Duffy Dep. at 43.

43. Hall sent letters to various pilot groups encouraging them not to work for United in the event of a strike. Tr. 755–57; Def.Ex. 92.

### 4. Prestrike Negotiations

44. When the parties had failed to reach an agreement by April 15, 1985, the NMB declared an impasse in negotiations and the parties were released from mediation. The NMB offered arbitration to resolve the dispute in accordance with Section 5 of the RLA, 45 U.S.C. § 155. United promptly rejected arbitration. ALPA did not respond. The NMB, on April 16, "released" the parties from mediation, thus commencing the final 30-day "cooling-off" period under the RLA. Tr. 963. United and ALPA continued to negotiate during the 30-day cooling-off period which ended at midnight on May 16, 1985. Tr. 963.

45. During the time that United communicated its strike plans to the pilots, collective bargaining negotiations continued between ALPA and United. United stated that, in the prestrike negotiations, the parties made a "lot of movement ... with the objective being to try and reach an agreement." Tr. 485, 501.

46. The final prestrike negotiations took place in Boston during the week of May 13. On that date, United made a new proposal which continued to include its reduced pay scale for new hires. Pl.Ex. 18. On May 14, ALPA reiterated its position that the new-hire scale should exist only for the first five years of the scale and should then "merge" with, or equal, incumbent rates in the sixth year of service. Thomson Dep. at 52. ALPA indicated its agreement to United's rates for the first five years with the intent, as perceived by United, of resolving the new-hire pay issue. Tr. 498.

47. On Wednesday, May 15, the parties addressed their attention to the remaining issues other than the new-hire scale and concluded these other issues by the morning of May 16. Thomson Dep. at 59–60. The only remaining issue was the new-hire pay scale. Stipulation at ¶ 10.

48. Negotiations then resumed on the new-hire pay scale at approximately 1:00 p.m. on May 16. Thomson Dep. at 60–61. United proposed that the parties first reach agreement on the rates for the first five years and then move to the other issues. The ALPA committee suggested that this "piecemeal" approach was not useful in light of the time remaining. The United negotiators agreed. At 2:00 p.m., the parties adjourned to their caucuses. Thomson Dep. at 62.

49. At approximately 6:00 p.m. on May 16, the parties again met at the negotiating table. United made its final prestrike proposal on the new-hire pay scale. Thomson Dep. at 63; Tr. 1046. United proposed that new-hire rates be agreed to for the first five years, and that rates beyond the fifth year be decided through either subsequent negotiations or an agreed-to formula measuring competitive rates in the industry. There could be no merger with incumbent rates until some point after the new-hire pilot began serving as a captain. Stipulation at ¶ 10. The ALPA negotiators were, in United's words, "extremely dis-

appointed" in United's proposal and told United "that it was not the kind of agreement that they could take back to the UAL–MEC." Thomson Dep. at 67. ALPA suggested that negotiations continue in Chicago, but United now refused to leave Boston unless the ALPA negotiators first agreed to United's proposal. The NMB also objected to leaving. Tr. 975, 1047. Accordingly, the negotiators remained in Boston.

50. During the evening of May 16, representatives of the two sides had a number of off-the-record discussions. Tr. 975–78. Then, at 10:50 p.m. Chicago time, Hall submitted a response to United's last proposal to Ferris, who was in charge of United's negotiating positions. Thomson Dep. at 59. Ferris rejected the proposal and asked that it be transmitted from the ALPA negotiators to United's negotiators in Boston so that they could "formally reject it." Tr. 1261. The UAL–MEC then voted to authorize the strike to commence at 0001 EDT (11:01 p.m. Chicago time). Tr. 1260–61. United made no request to extend the strike deadline. Brashear Dep. at 26, 108. The United negotiators in Boston again rejected the last ALPA proposal. Brashear Dep. at 25–26.

51. After the ALPA proposal was rejected, the ALPA negotiators in Boston asked United to remain in Boston to continue negotiating that night or in the morning. Brashear Dep. at 108–9. United, however, believed that the existence of the strike was a reason not to continue negotiating that night. Tr. 1049–50. Pringle told the ALPA negotiators that he was returning to Chicago, stating his prediction that it would be a long strike and that United would meet with ALPA only as legally required. Tr. 1049–50; Brashear Dep. at 110. United made no counter-proposal to ALPA's final prestrike proposal.

C. *The Strike and United's Response*

52. Shortly after the strike began, United began to implement its flight operations strike plan, including the rebid of the airline and hiring of permanent replacements. United also began a program of telephoning pilots. A script was given to workers who conducted the calling. Pl.Exs. 23 and 23A. Under that script, if the pilot was not home when called, United would tell the person who answered his phone that, if the pilot did not return the call, he could be "declared a striker and ... removed from the payroll." If the pilot responded, but indicated that he would not fly, he was told,

> I'm sorry. I need to advise you that if you fail to accept this assignment, we will have no choice but to consider you a striker. As you may or may not know, most company benefits and compensation will be terminated immediately. United will also need to replace you as a pilot.

Pl.Ex. 23 at p. 2. The pilot was also told,

> It has been determined that those pilots who elect to return to work by 1800 Central Time Sunday, 5/19, will be allowed to participate in the rebidding of the airline.

Pl.Ex. 23A.

53. On Sunday, May 19, Ferris told one of the working pilots that it was a "mistake" for ALPA to strike, and that "now they'll have to come back on my terms." Rinaldi Dep. at 21, 39.

54. On Tuesday, May 21, Ferris told one of the striking pilots that the ALPA leadership had "misled ..., lied to ... and withheld information from" the striking pilots. Tr. 634. Ferris stated that he was the "1,300 pound gorilla," that the pilots "couldn't beat him," and that "ALPA was dead on the property." *Id.* Ferris added that "the only way to come back was to cross the picket line," and that "the rebid would stand." Tr. 637. Only about 500 pilots returned to service during the first three days of the strike, while the rebid was open. About half of the returning pilots were management pilots. Tr. 555.

55. During the strike, the ALPA Strike Committee sent a letter and manual to ALPA observer supervisors indicating that observers with cameras should take pictures of pilots and management people who crossed the picket line. Dubisky Dep. at

843; Def.Exs. 111, 163. ALPA proceeded to photograph working pilots during the strike. Stipulation at ¶ 12.

### 1. *Rebidding the Airline*

56. United's plan to rebid the airline in the event of a strike was one element of its operations adjustment plan. Pl.Ex. 22. To explain this rebid fully, the Court first sets forth several paragraphs from the parties' pretrial stipulation.

17. United employs pilots in the status of captain, first officer and second officer. They are employed on Boeing 737, 727, 767 and 747 equipment, and Douglas DC–10 and DC–8 equipment. As of May 16, 1985, each pilot operated from one of nine operating bases known as "domiciles," from which pilot flight assignments originate and to which they return. At that time the bases were Chicago, Cleveland, Denver, Honolulu, Los Angeles, Miami, San Francisco, Seattle and Washington. Some equipment was not operated from certain bases.

18. Under the 1981 Agreement, a pilot's position is defined as the combination of his status (*e.g.*, second officer), domicile (*e.g.*, Boeing 727); all pilots in line service hold such a position. Under the 1981 Agreement, vacancies in positions are created by normal attrition and by increasing the total number of positions through expansion of the airline; these vacancies are posted for bid; and the vacancies are then awarded to bidders by seniority. Under the 1981 Agreement, bidders who are not yet qualified to hold the positions awarded to them (*e.g.*, a Boeing 727 second officer needs additional training to serve as a Boeing 727 first officer) are provided the necessary additional training by United; if they qualify and begin line service in the awarded position, that becomes their new position. Sometimes, pilots bid for vacant positions without changing status or equipment merely because they wish to change domiciles.

19. Under the 1981 Agreement, vacancies posted for bid may be and have been from time to time cancelled by United before they are awarded; awarded vacancies may be and have been from time to time cancelled by United before or during training of the pilots to whom the vacancies were awarded.

20. When United reduces its fight operations, it may have an excess of pilots for needed operations. Under the 1981 Agreement, United then declares a surplus, announces a furlough of the surplus junior pilots, strictly according to inverse seniority, and then provides for the bumping of pilots, usually to lower positions, in order to have the correct number of captains, first officers, and second officers for each type of equipment at each base.

Stipulation at ¶ s 17–20.

57. The second officer position is generally regarded as the entry-level position in the airline. Stipulation at ¶ 33. The majority of United pilots seek to become captains. Tr. 282. United believes that it is important to its operations that its first officers and captains be pilots who have progressed through the United system. Tr. 552. To some pilots, choice of domiciles or equipment is also important. Tr. 281–82. Regardless of these varying personal preferences, the essence of the bidding system is the right of pilots to exercise their seniority, as they choose, to secure vacancies that are made available. Pl.Ex. 1, Sec. 8(c)(5)(a); Pl.Ex. 43, Sec. 8(c)(5)(a). With the exception of certain bidding restrictions which are not relevant here (*e.g.*, Pl.Ex. 43, Sec. 8(D), Sec. 8(c)(5)(b) ), "[T]he most senior pilot bidding on an assignment vacancy ... shall be awarded such assignment." Pl.Ex. 43, Sec. 8(c)(5)(a).

58. Under the 1981 and 1985 Agreements, United is free to cancel vacancies before they have been awarded or even after they have been awarded if the pilot has not yet been activated in the assignment. The vacancy may be canceled even if the pilot is in training for the assignment. Stipulation at ¶ 19; Tr. 280. United does not regard the award of a vacancy as an "irrevocable promise" that the pilot will be activated in the awarded assignment.

Tr. 124. The pilot to whom a vacancy has been awarded, however, is entitled to certain compensation and expenses if someone else is allowed to serve in that assignment after it has been activated. Pl.Ex. 43, Sec. 8(E)(3).

59. Shortly after the strike began on May 17, United canceled all assignments of all pilots, strikers and nonstrikers. Tr. 264, 575. The result of the cancellation was to create vacancies in every position in the airline. United then allowed the nonstrikers, including management pilots, who reported before 6:00 p.m. Chicago time on May 19, to bid for these jobs, with the exception of the jobs at the Miami and Washington domiciles. Tr. 266, 271.

60. Approximately 525 nonstriking pilots participated in the rebid; about half were management pilots. Pl.Ex. 32D; Tr. 555–56. The vacancies were not awarded until sometime after June 1. Thomson Dep. of June 1, 1985 at 94. During the strike no pilot was activated in any assignment awarded to him in the strike rebid. Tr. 283.

61. United considered the rebid plan an "integral part" of United's total strike plan. Barry, Tr. 312. According to United, the rebid would "diminish the urge for an individual to strike for a few days and return" (Tr. 310), and would create fear in the pilots that they "could be permanently locked out" of their "previous job." With the rebid, a pilot who was considering whether to strike might fear that a junior pilot would "come in at the beginning of the strike, bid for and be awarded [his] job." Tr. 311. Thus, the rebid window was limited to three days, within the "critical phase" planned by United. Tr. 308.

62. The effect of the rebid awards is as follows:

a. The group with the lowest pilot seniority on the airline, those members of the Group of 500 who crossed the picket line and were awarded seniority numbers on May 17, 1985, were awarded DC–10 first officer or various captain positions. The DC–10 assignments represented a gain of at least 2,300 places on a seniority list of 5,800, and the receipt of a position which prior to the strike had only been available to pilots with 19 years service. The captain positions represented a gain of between 2,960 and 5,090 places on the seniority list, and had required before the strike between 19 and 29 years service. Court Ex. 1 at ¶ 43(2); Pl.Ex. 32G.

b. In the lowest paying pilot position on United (B–727 second officer), 25 of 33 rebidding pilots (excluding the new hires) were awarded B–747 second officer or higher paying positions, representing at least an 11-year gain in service (from the median seniority of the B–727 group to the lowest seniority in the B–747 second officer group). Thirty-three of the 37 rebidding pilots had less than the median seniority for the incumbent B–727 second officer group. Prior to the strike, only 4 of the 767 incumbent B–727 second officers had sufficient seniority to hold a B–747 second officer position. The gain in income from B–727 second officer to B–747 second officer is approximately $26,000. Tr. 665; Pl.Ex. 32; Def.Ex. 178.

c. In the lowest paying first officer position (B–737 first officer), 9 of 17 rebidding pilots were awarded DC–8/B–767 captain or DC–10 captain positions, with a 4-year gain in seniority (from B–737 first officer median seniority to lowest DC–8/B–767 captain seniority) and $55,000 gain in pay for DC–8/B–767 captain and 12-year gain in seniority (from B–737 first officer median seniority to lowest DC–10 captain seniority) and $66,000 gain in pay for DC–10 captain. Prior to the strike, only one of 284 B–737 first officers had sufficient seniority to hold any of these captain positions. Pl.Ex. 32; Def.Ex. 178.

d. Thirty-one of 61 rebidding B–727 first officers were awarded DC–10 captain positions. Prior to the strike, none of the 824 incumbent B–727 first officers had sufficient seniority to hold a DC–10 captain position. The gain in years of service from the median seniority of B–727 first officer to the lowest seniority for DC–10 captain is 10 years. The gain in income from B–727

first officer to DC–10 captain is $60,000 per year. Pl.Ex. 32; Def.Ex. 178.

e. In the DC–8 and B–767 first officer positions, 35 of 57 rebidding pilots were awarded DC–10 captain positions, with a seniority gain of 10 years (from median DC–8/B–767 first officer seniority to lowest DC–10 captain seniority) and salary gain of $51,000 per year. Prior to the strike, none of the DC–8/B–767 first officers had sufficient seniority to hold a DC–10 captain position. Pl.Ex. 32; Def.Ex. 178.

f. In the DC–10 first officer position, 12 of 16 rebidding pilots were awarded DC–10 captain positions with a 9-year gain in seniority (from DC–10 first officer median seniority to lowest DC–10 captain seniority) and $44,000 per year gain in pay. Prior to the strike, one of 272 DC–10 first officers had sufficient seniority to hold a DC–10 captain position. Pl.Ex. 32; Def.Ex. 178.

g. In the lowest paying captain position (B–737 captain), 24 of 37 rebidding pilots were awarded DC–10 or B–747 captain positions, with an 8-year gain in seniority (from median B–737 captain to lowest DC–10 captain seniority) and $32,000 gain in pay (from B–737 to DC–10 captain). Prior to the strike, 10 of 280 B–737 captains had sufficient seniority to serve as a DC–10 or B–747 captain. Pl.Ex. 32; Def.Ex. 178.

h. In the B–727 captain position, 82 of 104 rebidding pilots were awarded DC–10 or B–747 captain positions, with a 5-year gain in seniority (from B–727 captain median seniority to DC–10 captain lowest seniority) and $24,000 gain in pay. Prior to the strike, 90 of 842 B–727 captains had sufficient seniority to hold a DC–10 or B–747 captain position. Of the 82 rebidding B–727 captains, awarded DC–10 or B–747 captain positions, only 2 had sufficient seniority to hold those positions prestrike, and one of those two had exercised his seniority prestrike to hold a B–727 captain position in Miami, a domicile not utilizing DC–10 or B–747 equipment, which alternative was not available in the system rebid. Pl.Ex. 32; Pl.Ex. 32J, pp. 5–20; Def.Ex. 178.

i. In the DC–8/B–767 captain positions, 17 of 47 rebidding pilots were awarded B–747 captain positions, with a 2-year gain in seniority (from median to DC–8/B–767 captain seniority to lowest B–747 captain seniority) and $31,000 gain in pay. Prior to the strike, 4 of 289 DC–8/B–767 captains had sufficient seniority to hold a B–747 captain position. Pl.Ex. 32; Def.Ex. 178.

j. While the system rebid did not serve as a positive inducement to those already holding the highest paying positions they were eligible to or preferred to hold (*e.g.*, B–747 captain; B–747 second officer for those older than 60; equivalent DC–10 positions for those wishing to fly in a domicile not utilizing B–747 equipment), the coercive element of the rebid for these pilots, particularly B–747 captains, was particularly acute. The combination of the announced rebid and recall policies made it highly unlikely that these pilots would ever work again for United. Pl.Ex. 16, pp. 4–5; Pl.Ex. 32D; Pl.Ex. 32E; Def.Ex. 178; Tr. 469–70, 729.

63. The disadvantages to striking pilots results from the fact that the rebid will have the general effect of blocking new vacancies which will arise after the strike and would otherwise have been awarded to pilots who participated in the strike and have greater seniority than nonstrikers awarded similar assignments in the rebid. Tr. 668. In particular, almost all assignments in the two highest paying positions on the airline, B–747 captain and DC–10 captain, will be awarded to nonstrikers. Pl.Ex. 32E; Pl.Ex. 32D.

64. While attrition in current B–747 captain ranks as a result of disqualification by the Federal Aviation Administration Age 60 Rule, 29 CFR § 121.383(c), will produce 46 B–767 captain vacancies over the next two years, all of these vacancies will be filled by nonstrikers who did not occupy a B–747 captain position prior to the strike. Tr. 673; Pl.Ex. 32H. Of the 55 nonstrikers who were not B–747 captains prior to the strike and were awarded a B–747 captain position in the rebid, only two had sufficient seniority to serve as a B–747 captain

prior to the strike. Pl.Ex. 32; Pl.Ex. 32H; Pl.Ex. 32J, pp. 8, 9) and 15 had seniority numbers in the range of the two hundred places below the most junior B–747 captain prestrike (seniority numbers 254–455). Pl.Ex. 32; Pl.Ex. 32J, pp. 11–14.

65. The impact of the rebid on B–747 captain vacancies will continue beyond two years (Tr. 673), since the younger rebidders may occupy these seats until age 60. The youngest rebidder does not reach age 60 until 1994. Tr. 674. The rebid blocks 211 DC–10 captain positions well into the future. Pl.Ex. 32, p. 7; Pl.Ex. 32D; Tr. 675.

66. While expansion in the flying of B–747 or DC–10 equipment will create additional captain vacancies, such expansion does not change the impact of the system rebid but merely shifts it from one part of the seniority list to another. Tr. 675–76.

### 2. Higher Salaries for Permanent Replacement Pilots

67. Prior to the strike, United placed advertisements for what it called "fleet-qualified permanent replacement pilots." These pilots were already qualified to serve as captains or first officers on the kind of jet equipment flown by United. Pl.Ex. 13. United offered to pay candidates rates of $75,000 per year for captains and $50,000 per year for first officers. *Id.* These rates were guaranteed minimums, so long as the pilots were employed by United, although after the strike they could be required to serve as second officers where the normal rates of pay for new-hire second officers would be substantially less. Pl.Ex. 18; Pl.Ex. 43, Sec. 3.C.

68. The maximum fifth-year rate of pay for new-hire second officers under the 1985 Agreement is $39.74 per hour for 81 hours monthly, or $38,627 per year. Even if some permanent replacements achieve a B–737 or B–727 first officer position prior to the amendable date (which has taken a minimum of five years in the past), the third-year rate of pay for a B–727 first officer is $42.31 per hour for 81 hours monthly, or $41,125 per year, which is still less than the guarantee for "fleet qualified."

69. Some of the offers made to the replacement pilots contained reporting dates which fell after the strike ended. Tr. 1302. United presently intends to honor the pay commitments if the pilot reported as scheduled, although the pilot did not work or undergo training during the strike. Tr. 64, 1150. These pilots were advised that, on the conclusion of the strike, they might be demoted to second officer in accordance with their standing on the seniority list.

### D. Post-Strike Negotiations and Settlement

70. On May 20, United agreed to resume negotiations with ALPA. Within two to three days, the parties reached a tentative agreement on the new-hire pay scale issue. Tr. 983–84; Pl.Ex. 43, Sec. 3(B)(1)(C).

71. After the negotiators concluded the tentative agreement on the economic package, they turned their attention to the terms of a back-to-work agreement. Negotiations continued on May 23, 24 and 25. By the morning of May 25, the parties were separated by four, or possibly, five issues. Specifically, ALPA proposed that United not implement the system rebid which it had conducted May 17–19; that the fleet-qualified permanent replacements be paid in accordance with the contractual rates of pay, rather than the $75,000 and $50,000 rates specified by United; that United place into service the Group of 500 pilots whom United had trained prior to May 17 but who refused to cross the picket lines during the strike; and that United restore to their jobs several TCAs who had honored the ALPA picket lines as line pilots on the pilot seniority list. Tr. 987; Def.Ex. 52.

72. All of the above issues were discussed at the bargaining table on May 23–25. Tr. 987–995. United's positions were that it intended to (1) implement the rebid; (2) continue paying the premiums to the permanent replacements; (3) refuse to replace the striking TCAs into their prestrike positions; and (4) refuse to employ the Group of 500. Tr. 1065–66. United had

not yet awarded the results of the rebid. Thomson Dep. at 94.

73. United's stated reason for its position on the Group of 500 was that to allow the Group to return would "strategically hurt us [United] in trying to operate through future strikes...." Tr. 1081. United asserts that it had told these individuals that if there were a work stoppage, they were expected to "go to work and fly their first trip." Tr. 514. According to United,

> [I]f the corporation were to make statements and then turn around and just willy-nilly say: well, those statements don't mean anything in a back-to-work agreement, they are just all gone, we don't live up to these things, then where is this corporation's position for the future? We don't want another work stoppage, but what if one occurred? Where would our ability be to hire permanent replacements if we did not live by our word? This corporation's word is its bond and it must live by it.

Tr. 493.

74. The parties also discussed in the May 23–25 negotiations the question of how United would handle its dispute with the Association of Flight Attendants ("AFA"), who had honored the ALPA picket lines. ALPA's position was that its back-to-work agreement with United should be made contingent on United and the AFA "reaching a Back-to-Work Agreement". Def.Ex. 52 at ¶ 18. This was in keeping with a commitment that ALPA made when it requested AFA to respect the ALPA strike. At that time ALPA stated:

> In the event ALPA withdraws its services on United Airlines, please be advised that ALPA will, should the Flight Attendants support our effort and honor our picket line, pledge not to return our members to work at the conclusion of our strike until such time as an appropriate return-to-work agreement is negotiated on behalf of AFA's membership.

Def.Ex. 57. United negotiated with ALPA as to the AFA issue. Tr. 1067. United's position was that it would meet with AFA and work out or attempt to work out a back-to-work agreement. Tr. 1067. So far as ALPA was concerned, United's statement constituted a verbal understanding that United would meet with AFA to discuss their back-to-work agreement. Brashear Dep. at 44; Pl.Ex. 91. United disputes that there was a verbal understanding and accuses ALPA of misleading the federal mediators to believe that there was. Tr. 1070–71.

75. In the morning of May 25, with four or five open issues separating the parties, the back-to-work negotiations broke off. On June 4, 1985, the NMB requested United and ALPA to resume negotiations. Tr. 996. United promptly refused, asserting that it would not even return to the table until ALPA first withdrew "demands" regarding the Group of 500, AFA back-to-work agreement, and former TCAs. Def.Ex. 53. United described the strike as "frivolous" and stated that it would be "free to re-evaluate" terms of the tentative agreement "in the near future" if the strike continued. *Id.*

76. By June 10, 1985, United returned to mediation as a result of a conversation between representatives of the two parties. Tr. 997. On June 12, the federal mediator presented a back-to-work proposal which was accepted by the two sides, subject to ratification by ALPA. Pl.Ex. 43. ALPA agreed to expedite its normal ratification process, and United agreed that the proposal would be binding through June 15, 1985. *Id.*, ¶ s 1 and 16.

77. The back-to-work agreement provided that striking pilots would be offered a return to the active payroll effective the day after notification to United that ratification had occurred, and that the pilots would be returned to the same domicile, status, and equipment to which they were assigned on May 16 with normal accrual of seniority. The parties agreed that neither would "engage in or condone any activities which might constitute reprisals or recriminations as a result of the ALPA strike," that United would withdraw charges or discipline against pilots for strike-related

activities and would take no further action against ALPA or pilots for these activities, and that ALPA would take no disciplinary action against nonstriking pilots. Finally, United agreed that ALPA would pursue its claims regarding the Group of 500, rebid and replacement pay in this Court.

78. On June 12, the UAL–MEC was called into session. Tr. 1252. Although no written copy of the tentative agreement or Mediator's proposal was yet available, the UAL–MEC was given a general briefing on the contract and legal issues involved in the settlement. Tr. 1253. On June 13, the documents were made available to the UAL–MEC, which received an extensive briefing on all issues, including the basic contract terms, from the ALPA negotiating committee. Tr. 1255. On June 14, the UAL–MEC received further detailed legal briefing from counsel, and debate over the proposed settlement began.

79. Around 9:15 p.m. on June 14, the AFA reported to the UAL–MEC that AFA's back-to-work negotiations with United had broken down, and that the flight attendants would return to work without a back-to-work agreement. Tr. 1256. AFA "released" the UAL–MEC from its earlier pledge that it would not return the pilots to work unless the flight attendants were also protected in their own back-to-work agreement. Tr. 1258). The UAL–MEC then debated the question whether the UAL–MEC should defer any vote on ratification until the UAL–MEC members had taken the settlement back to their local councils to seek membership input. Although it initially appeared that this would be done, there was concern that United might withdraw the offer if it was not ratified by midnight June 15. As a result, the UAL–MEC first voted that it would decide the ratification issue on the evening of June 14, then voted to ratify. Tr. 1259. This ended the strike.

80. At the conclusion of the strike, United restored all pilots to their prestrike assignments. Tr. 293, 297, 1231. As a result, the vacancies that United created at the beginning of the strike no longer exist. Tr. 297, 1231. When new vacancies arise in the future, due to attrition from the pilot ranks or expansion of flying at a domicile, United intends to award those vacancies in seniority order to nonstriking pilots who had received awards of comparable vacancies during the strike. Tr. 293. United will do so even if a more senior striker wishes to bid for and receive the new vacancy. Tr. 1232–33. United intends to grant a preference for new vacancies to nonstriking pilots. Tr. 296–97.

81. United's policy with respect to the Group of 500 who did not report to work on May 17, 1985, is that they will never become United employees. Tr. 451, 1165–66.

82. United expects to expand and will need additional pilots. Tr. 121, 551. United has already offered second officer jobs to nearly 700 additional pilots, of whom only about 300–350 entered training during the strike. Tr. 246–47. The remaining pilots would enter training after the strike was settled. Nonetheless, United's position as expressed to the Court is that it will not employ any of the Group of 500 who refused to cross the picket lines during the strike. Tr. 56. United's policy is that "this Group of 500 will not be employed by United." Tr. 121. The only possible exception to this policy is that if the individual did not report on May 17 due to "personal hardship" or "extenuating circumstances," he or she would be "offered employment." Tr. 251. United, however, will not consider those who failed to report on May 17 "if their reason for failing to show up for work was a refusal to cross the picket line." Tr. 366.

83. United presently intends to continue paying fleet qualified permanent replacement captains and first officers $75,000 and $50,000, respectively, notwithstanding contrary rates set by the 1985 Agreement and notwithstanding the fact that the permanent replacements may, in the future, be demoted to second officers.

84. United has recently agreed in principle to purchase the Pan American World Airways Pacific Division for $750 million. Tr. 508. UAL, Inc. has recently agreed to purchase the Hertz Corporation for $587.5

million. Tr. 509. United has begun a process to recapture from employee pension funds certain asserted overfunding in the amount of $950 million. Tr. 510. United has agreed to purchase 25 Boeing-737 aircraft from Frontier Airlines. Tr. 1281. United may soon purchase from the Boeing Company approximately 20 new B-767 aircraft. Tr. 1281.

85. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## II. CONCLUSIONS OF LAW

### A. *Applicable Law*

1. This action arises under, and is governed by, the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("the RLA"). The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

2. Section 152, First of the RLA provides, in part, that it shall be the duty of both management and labor "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce...." 45 U.S.C. § 152, First (hereinafter "Section 2, First").

3. Section 152, Third of the RLA provides, in part, that representatives, for the purposes of collective bargaining, "shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives." 45 U.S.C. § 152, Third (hereinafter "Section 2, Third").

4. Section 152, Fourth of the RLA provides, in part, that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing." Furthermore, Section 2, Fourth mandates that "[n]o carrier ... shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their

choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ..., or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization...." 45 U.S.C. § 152, Fourth (hereinafter "Section 2, Fourth").

5. Section 152, Fifth of the RLA provides, in part, that "[n]o carrier ... shall require any person seeking employment to sign a contract or agreement promising to join or not to join a labor organization." 45 U.S.C. § 152, Fifth (hereinafter "Section 2, Fifth").

6. Finally, Section 152, Seventh provides that "[n]o carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements [except as provided in 45 U.S.C. § 156]." 45 U.S.C. § 152, Seventh (hereinafter "Section 2, Seventh").

7. As the Supreme Court has repeatedly stated, the heart of the Railway Labor Act is the duty, imposed by Section 2, First upon management and labor, "to exert every reasonable effort to make and maintain agreements ... and to settle all disputes ... in order to avoid any interruption to commerce...." *Chicago & North Western Railway Co. v. United Transportation Union*, 402 U.S. 570, 574, 91 S.Ct. 1731, 1734, 29 L.Ed.2d 187 (1970); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969). To that end, the RLA provides a detailed framework to facilitate the voluntary settlement of major disputes. The parties must give advance notice of proposed changes, confer to discuss the proposals and submit to the mediation services of the National Mediation Board. If either party rejects the Board's offer of arbitration, the President may create an emergency board to investigate the dispute. While the dispute is "working its way through these stages, neither party may unilaterally alter the *status quo.*" *Jacksonville Terminal, supra,* 394 U.S. at 378, 89 S.Ct. at

1115 (*citing* Sections 2, Seventh; 5 First; 6 and 10).

■ 8. After the statutory procedures of the RLA have been exhausted, the parties are free to "employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." *Id.* at 392, 89 S.Ct. at 1123. The RLA, however, imposes two competing obligations upon a carrier in the event of a strike. First, the carrier has a duty to make all reasonable efforts to continue its operations during a strike. Section 2, First; *Railway & Steamship Clerks v. Florida East Coast Railway Co.*, 384 U.S. 238, 246–47, 86 S.Ct. 1420, 1424–25, 16 L.Ed.2d 501 (1966). That duty is grounded in the policy expressed by the RLA of avoiding the interruption of commerce. That duty, however, must be weighed against another duty: maintaining the continuity of the employer-employee relationship. *Florida East Coast, supra*, 384 U.S. at 247, 86 S.Ct. at 1425; *Empresa Ecuatoriana de Aviacion, S.A. v. District Lodge*, 690 F.2d 838 (11th Cir.1982). That relationship, like the collective bargaining agreement which memorializes the relationship, "is not destroyed by the strike, as the strike represents only an interruption in the continuity of the relation." *Florida East Coast, supra*, 384 U.S. at 246–47, 86 S.Ct. at 1424–25. When a strike occurs, the carrier is placed into the admittedly precarious position of balancing its "twin obligations to serve the public and to attempt reasonably to maintain the employer-employee relationship." *Empresa, supra*, 690 F.2d at 845. These "twin obligations" are enforceable by the judiciary, and the carrier's conduct during a strike must withstand judicial scrutiny under the obligations imposed by the RLA. *Chicago & North Western Railway, supra*, 402 U.S. at 574, 91 S.Ct. at 1733. "While the carrier has the duty to make all reasonable efforts to continue its operations during a strike, its power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored." *Florida*

*East Coast, supra*, 384 U.S. at 247, 86 S.Ct. at 1425.

■ 9. In considering the general boundaries of permissible self-help under the RLA, the Court may resort to the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.* ("NLRA") for assistance. *Jacksonville Terminal, supra*, 394 U.S. at 391, 89 S.Ct. at 1122. To the extent, however, that the policies of the RLA and NLRA differ, the Court may not incorporate into the RLA the "panoply of detailed law developed by the National Labor Relations Board and courts under [the NLRA]." *Id.* at 391, 89 S.Ct. at 1123. For example, the Court in *Jacksonville Terminal* refused to incorporate the NLRA's prohibition against secondary boycotts into the RLA because Congress had expressly refused to enact a provision similar to § 8(b)(4) of the NLRA into the RLA. *Id.*

### B. *The Group of 500*

10. Section 2, Third and Fourth of the RLA create judicially enforceable rights of employees to be free from carrier coercion based on union activity. *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914 (7th Cir.1974). In *Conrad*, the court construed Section 2, Fourth to protect a probationary pilot from discharge during the term of a collective bargaining agreement in retaliation for his "overactivity" as an apprentice member of ALPA, the designated bargaining representative of Delta pilots. In doing so, the court relied on authority applying §§ 8(a)(1) and (2) of the NLRA. Section 2, Fourth is therefore comparable to §§ 8(a)(1) and (2) of the NLRA. *See also Brotherhood of Railroad Trainmen v. Georgia Railway Co.*, 305 F.2d 605 (5th Cir.1962).

11. Section 8(a)(3) of the NLRA prohibits employer discrimination "to encourage or discourage membership in any labor organization." Section 2, Fourth of the RLA prohibits employer coercion of employees "to induce them to join or remain or not to join or remain members of any labor organization." Although literally addressing only union "membership," both sections

are broadly construed to protect a wide range of union-related activity. Indeed, the Supreme Court has held that under § 8(a)(3), discrimination to discourage "membership" in a union "includes discouraging participation in concerted activities ... such as a legitimate strike." *N.L.R.B. v. Erie Resistor Corp.*, 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963). There is no basis in the language of Section 2, Fourth or the policies of the RLA to construe Section 2, Fourth more narrowly than § 8(a)(3) of the NLRA. It is inconceivable that the railroad unions, which negotiated the terms of the RLA as enacted in 1926, and Congress, which enacted Section 2, Fourth in 1934, intended the right to strike to be "integral to the Act" and "within the core of protected self help," but at the same time did not intend any statutory protection against employer retaliation for engaging in a lawful strike. Accordingly, cases construing section 158(a)(1) and (3) may be applied, by analogy, to the facts of this case.

12. United, however, argues that the Group of 500 were not employees, and thus, have no judicially enforceable rights under Section 2, Third or Fourth. The RLA defines "employee" as including "every person in the service of the carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee...." 45 U.S.C. § 151, Fifth. The Supreme Court has stated that the term "employee" should be broadly interpreted to fulfill the intent of Congress to regulate the entire employment relationship. *Pennsylvania Railroad Co. v. Day*, 360 U.S. 548, 551–52, 79 S.Ct. 1322, 1324, 3 L.Ed.2d 1422 (1959). *See also Air Line Pilots Assoc., International v. Alaska Airlines, Inc.*, 735 F.2d 328 (9th Cir.1984).

13. United admits that its treatment of the Group of 500 was radically different than its treatment of student pilots in the past. Prior to the Group of 500, all student pilots were "employees" from the first day of training. Furthermore, student pilots accrued pilot seniority from their first date of service as a student pilot. The Group of 500 were trained in substantially the same manner as prior student pilots with the principal exception that United referred to the Group of 500 as "nonemployees."

14. Despite the significant differences between United's training of the Group of 500, contradictory statements regarding the employment status of Group members, free training at considerable cost to United, and $30 per day expense allowance given to Group members, the Court rejects ALPA's argument that the Group of 500 were employees of United upon their first day of training. Unlike prior United trainees, no one in the Group of 500 was paid a salary during his or her training. Furthermore, the training agreements entered into between Group members and United expressly provided that the student pilot was not an employee of United during training. *See e.g.,* Def.Ex. 140.

15. Although the Court rejects ALPA's argument that the Group of 500 became employees upon their initial date of training, the record is clear that all members of the Group of 500 had accepted United's offer of employment effective May 17, 1985. After Group members accepted United's offer of employment, United informed the student pilots that their change to "permanent status" would occur on May 17, 1985. Pl.Ex. 6. Although United may condition those offers upon the student pilot's successful completion of training, United's belated attempt to require members of the Group of 500 to cross a lawful picket line as a condition of employment is unlawful under the RLA.

16. Physically reporting to work to establish an employer-employee relationship is not a prerequisite to the right to strike on the first day of employment. In *N.L.R.B. v. New England Tank Inc.*, 302 F.2d 273 (1st Cir.1962), the employer had obtained a contract to take over operations on a gas pipeline but refused to hire most of the employees of the previous operator of the pipeline because of their union activities. The employer did offer employment

to three, each of whom accepted but later refused to report to work on the first day in protest of the employer's refusal to hire the others. The court, interpreting § 8(a)(1) and (3) of the NLRA, rejected the employer's argument that the three "had never actually effectuated an employer-employee relationship with the company and therefore could not 'strike' against it." *Id.* at 277. Although acknowledging that the individuals "never actually reported to work" for the employer (*Id.* at 277), the court held:

> On the present record to insist on a requirement that the three men physically report to the job before going on strike would be little more than an empty gesture.

*Id.* at 278.

17. Similarly, all of the Group of 500 had accepted unconditional offers of employment from United, with an effective date of May 17, 1985. United's later insistence that they physically report to the training center on their first day in order to become employees with the right to strike is precisely the same "empty gesture" rejected in *New England Tank.* United's attempt to manipulate the "employee" status of the Group of 500 with formalities does not justify applying Section 2, Fourth to deny employees the right to participate in a lawful strike on their first day of employment. Accordingly, the Group of 500 became employees of United May 17, 1985, their pilot seniority accrues as of that date, and their rates of pay are to be determined by the new-hire wage scale set forth in the 1985 Agreement.

18. Even assuming that the Group of 500 were not employees on May 17, 1985, or assuming that § 8(a)(1) and (3) are inapplicable to this case, United's conduct would be unlawful under the RLA because United unilaterally altered the *status quo* by instituting the "nonemployee" training program for the Group of 500. This conduct, alone, violates Section 2, Seventh of the RLA.

19. United could not have lawfully changed its historic practices and contractual commitments after it served its notice of intended change in the 1981 Agreement pursuant to RLA § 6, 45 U.S.C. § 156. After service of a § 6 notice, "neither party may unilaterally alter the *status quo.*" *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). The *status quo* provision broadly covers even noncontractual working conditions. United cannot bargain in good faith on the new-hire wage issue while, *at the same time*, train over 500 "nonemployees" to be hired under the lower wage rate of a new contract. The training of the Group of 500 is not only evidence of bad faith bargaining, but it is clearly a violation of United's obligation to keep the *status quo* during negotiations. The obligation imposed on both parties,

> is to preserve and maintain unchanged those *actual, objective working conditions and practices*, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.

*Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 152–53, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). United, in effect, abrogated the contract with respect to all those pilots for whom the point of transition from student pilot to line pilot was altered by United's unilateral change in policy. United cannot rely on its own unlawful conduct to justify depriving the Group of 500 of their employee status and the protections of the RLA.

20. Furthermore, United's treatment of the Group of 500 was unlawful (even if the Court were to assume they were not employees on May 17) because United violated Section 2, Fifth of the RLA, which provides that no carrier "shall require *any person* seeking employment to sign any contract or agreement promising to join or not to join a labor organization." (Emphasis added.) The protection of Section 2, Fifth, thus extends to "any person" and not just "employees." By making employment contingent on crossing the picket

line, United has violated Section 2, Fifth by requiring "persons" not to join the union or its activities. United was clearly aware that requiring the student pilots to cross a lawful picket line would disqualify them from future union membership.

21. The language in Section 2, Fifth prohibiting agreements to "join or not to join a labor organization" is virtually identical to that enacted the same year in Section 2, Fourth, and to that enacted a year later in NLRA § 8(a)(3), and, accordingly, must be construed broadly, as are the latter two provisions, to cover a wide range of union activities. Even limited to its literal terms, however, Section 2, Fifth covers United's attempt to coerce a promise not to respect ALPA's picket line.

22. The NLRA reflects the same concern about prehire discrimination on the basis of union membership or activity. In *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 188, 61 S.Ct. 845, 849, 85 L.Ed. 1271 (1941), the Court emphatically rejected an employer's attempted distinction between "discrimination in denying employment and in terminating it" as being in defiance of basic policies under the NLRA. The Court recognized that discrimination at the time of hire violated the policy of protecting workers' right to self-organization, and stated:

> Such a policy is an inevitable corollary of the principle of freedom of organization. Discrimination against union labor in the hiring of men is a dam to self organization at the point of supply. The effect of such discrimination is not confined to the actual denial of employment; it inevitably operates against the whole idea of the legitimacy of organization.

*Id.* at 184–85, 61 S.Ct. at 848. The RLA plainly embodies the same policies. Section 2, Third, Fourth, and Fifth collectively are expressly designed to protect from employer coercion workers' rights to organize and act collectively both before and after the date of formal hire. Section 2, Fifth, therefore, should not be given a narrow interpretation and must be read as prohibiting an employer from refusing to hire an individual on the basis of his union activity.

23. United's final justification for its policy toward the 500 is that allowing them to return would hamper its ability to hire "permanent replacements" in the event of future strikes. This justification, however, is not convincing. United established a program for hiring permanent replacements. The jobs advertised to these individuals were openly contingent on a strike taking place. This included the hiring of new second officers, as to whom job offers were made to be effective "only in the event of a strike." In contrast, United's program for the Group of 500 was to hire them when a contract was reached, and the job offers of April 20 were not contingent on working during a strike. *Compare* Pl. Exs. 8 and 12 *with* Pl.Exs. 13 and 14 and Def.Exs. 71 and 72. United advised some members of the Group of 500 that they would not be required to work during a strike. In fact, United admits that it did not hire the Group of 500 to be "crossovers." Tr. 50. It was only after the Group of 500 had returned to Denver that United attempted to coerce them into serving during the strike. Requiring United to restore the Group of 500 will not preclude United from honestly and openly advertising for, hiring and training permanent replacements if it becomes enmeshed in another labor dispute with ALPA or any other labor organization.

24. In summary, the Group of 500 were employees of United on May 17, 1985. United's condition that the student pilots cross a picket line on their first day of work was unlawful. Since the union remains the bargaining representative for "all employees in the designated craft, whether union members or not" (*Railway Clerks v. Florida East Coast*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966)), United's contention that ALPA lacks standing to assert claims on behalf of the Group of 500 is without merit. *See also Burke v. Compania Mexicana de Aviacion*, 433 F.2d 1031, 1033 (9th Cir. 1970).

### B. *Rebidding the Airline*

25. As of the first day of the strike, United canceled all prestrike job assignments and posted the vacancies created by that cancellation for rebidding. Only nonstriking pilots were eligible to bid for the newly opened up jobs. At the conclusion of the strike, United agreed to return all pilots to their prestrike assignments, thereby eliminating the vacancies posted for rebid. Now that the strike is settled, United will fill new vacancies which will arise after the strike is over, granting to nonstriking pilots who participated in the rebid priority over former striking pilots with higher seniority. Many of the nonstrikers will obtain positions that they could not hold by exercising their seniority, and would not be able to hold for many years. Returning strikers will be barred from exercising their seniority to bid for new vacancies in positions permanently awarded to nonstrikers, even though those nonstrikers may have lesser seniority than the strikers.

26. After the RLA procedures for resolution of a major dispute have been exhausted, the parties may employ "the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." *Jacksonville Terminal, supra,* 394 U.S. at 392, 89 S.Ct. at 1123. The RLA, however, imposes "twin obligations" upon the carrier to serve the public by reasonably attempting to operate during a strike and reasonably attempting to maintain the employer-employee relationship. *Empresa, supra,* 690 F.2d at 845. The employer-employee relationship is "not destroyed by the strike, as the strike represents only an interruption in the continuity of the relation." *Florida East Coast, supra,* 384 U.S. at 246–47, 86 S.Ct. at 1424–25. "While the carrier has the duty to make all reasonable efforts to continue its operations during a strike, its power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored." *Id.* at 247, 86 S.Ct. at 1425. *See also Hendricks, supra,* 696 F.2d at 677.

27. In *Empresa, supra,* 690 F.2d 838, the court held that the RLA permitted a carrier to replace striking employees only "as needed in order to continue to meet its cargo and passenger flight schedules, perform its necessary internal business functions, and avoid losing customers and revenue to competitors." *Id.* at 844. The court stressed, however, that there was no evidence of punitive conduct on the part of the carrier during the strike. *Id.* at 845.

28. Similarly, § 8(a)(1) of the NLRA protects from employer interference the "rights of employees to engage in concerted activities, which . . . include the right to strike." *N.L.R.B. v. Erie Resistor Corp.,* 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963). Section 8(a)(1) of the NLRA is analogous to Section 2, Fourth of the RLA. *See* ¶s 10 and 11, *supra.* Accordingly, cases interpreting § 8(a)(1) are helpful in defining a carrier's rights and responsibilities under Section 2, Fourth of the RLA.

29. In this case, the granting of permanent super-seniority to replacement pilots cannot be viewed by the Court as "needed" for the continued operation of United during the strike. Additionally, the super-seniority granted to replacement pilots will continue to disadvantage striking pilots for many years. As the Supreme Court noted in *Erie Resistor, supra,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, "super-seniority by its very terms operates to discriminate between strikers and nonstrikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted." *Id.* at 231, 83 S.Ct. at 1147.

30. The claimed business justifications offered by United are insufficient to outweigh the inherently destructive effects of the rebid. United's rebid policy not only accomplishes all the evils outlined by the Court in *Erie Resistor,* but it operates even more effectively than the limited form of super-seniority in that case. In contrast to *Erie Resistor,* where the super-seniority became effective, if ever, only in the event

of future layoffs, the benefits and punishments of United's post-strike implementation of the rebid will have an ongoing, daily effect on the rates of pay, job status, and benefits of both those nonstrikers who will occupy the rebid jobs and those strikers who will be blocked from those jobs. Nonstrikers will be able to obtain positions in the system substantially better than those which their seniority would permit. Strikers will be blocked from bidding for many of the best jobs in the system which were awarded to nonstrikers. Thus, if the form of super-seniority in *Erie Resistor* was so destructive of the right to strike as to be unjustifiable by business necessity, United's more effective version is even less justifiable.

31. United's argument that crossover pilots are equivalent to permanent replacements and may therefore retain their job bids after the strike is also without merit. In each of the cases cited by United in support of its argument, the crossovers actually occupied and worked in the positions in question during the strike. In fact, in one of the cases, *International Assoc. of Machinists v. J.L. Clarke Co.*, 471 F.2d 694, 698 (7th Cir.1972), the court emphasized that in order for a crossover to be entitled to a job assigned during a strike, the employer must prove that the replacement actually occupied the position during the strike. The same principle applies under the RLA. Since an employer's right to hire replacements is based only on its needs to "continue in business," its right to fill positions permanently is limited to those actually occupied and used to continue in business during a strike. In this case, however, no United pilot worked in a rebid position during the strike; rather, United plans to implement the rebid awards to nonstrikers only when new vacancies in those positions arise at some time after the strike has ended.

32. In addition to the fact that United has failed to justify the rebid as reasonably necessary for its operations during the strike, ALPA has established specific evidence of United's intent of coercion and discrimination against union membership by virtue of the rebid procedure. "Such proof itself is normally sufficient to destroy the employer's claim of a legitimate business purpose...." *Erie Resistor, supra,* 373 U.S. at 227–28, 83 S.Ct. at 1145; *Conrad, supra* 494 F.2d at 918. United's plan to rebid the airline was part of the operations adjustment plan, a plan which was intended to break the strike by causing a "stampede" of striking pilots to cross the picket line. Tr. 302–04; 343; 464. Furthermore, United's stated policy at the time of the strike regarding its permanent replacements was that United intended to "reward the loyalty of those pilots who help us keep this airline running." Pl.Ex. 15. Finally, Ferris warned pilots shortly before the strike that the rebid would result in "penalty and harm and hurt" to striking pilots within 24 hours after the strike. "You don't show up for work, the harm will hit." Tr. 726–27. United's antiunion motivation in connection with the rebidding of the airline invalidates the procedure notwithstanding other legitimate motives. *Conrad, supra,* 494 F.2d at 918.

33. United's reliance upon *Giddings & Lewis, Inc. v. N.L.R.B.,* 675 F.2d 926 (7th Cir.1982), does not warrant a contrary result. In *Giddings*, the employer, faced with a strike which lasted more than a year, hired 323 permanent replacement workers. When the strike ended, the employer refused to reinstate a replaced striker but did agree to place the replaced strikers on a preferential hiring list. In the event of future layoffs, however, the employer's position was that permanent replacements and reinstated strikers would not lose their positions to more senior unreinstated strikers. The court held that the layoff procedure would not violate the NLRA because the employer was not discriminating against strikers in favor of nonstrikers. In this case, the striking pilots have been reinstated to their prestrike positions; therefore, *Giddings* is inapplicable. Since United will continue to discriminate against the reinstated striking pilots by virtue of the super-seniority awarded to nonstrikers, the rebid was unlawful.

## C. *Higher Salaries for Permanent Replacement Pilots*

34. Fleet-qualified permanent replacement captains and second officers are presently being paid annual salaries of $75,000 and $50,000, respectively. These rates are in excess of the new-hire rates under the 1985 Agreement. ALPA argues that whatever business justifications may have existed during the strike for offering "super-pay" to incoming pilots, the inherently destructive post-strike implications of such a plan outweigh the benefits. ALPA argues that "super-pay" acts as the same type of "cleavage in the plant continuing long after the strike is ended" as super-seniority. *Erie Resistor, supra,* 373 U.S. at 231, 83 S.Ct. at 1147. This Court, however, disagrees with ALPA's basic premise that super-pay, like super-seniority, acts as a "sanction" to striking pilots.

35. ALPA relies on the holding of *Erie Resistor* in support of its argument that super-pay "stands as an ever present reminder" of the special rewards to those who refrained from striking and renders future collective bargaining virtually impossible. *Erie Resistor, supra,* 373 U.S. at 231, 83 S.Ct. at 1147. While the Court agrees with the sound application of such reasoning to United's super-seniority plan, the same is not true of super-pay.

36. United, while unable to rationalize super-seniority as a business justification, does make a sound argument in favor of super-pay. The record shows a lack of availability of qualified captains and first officers at the time of the strike which did require United to solicit the currently employed pilots of other airlines. This required the airline to offer a pay scheme sufficient to attract qualified replacements. Furthermore, the pay scales were reasonable considering the pilots' experience and qualifications.

37. In addition, super-pay does not have the same permanent, destructive effect upon pilots who chose to strike as does super-seniority. Although super-pay may serve as a reminder of who did and did not honor the strike, it does not disadvantage striking pilots by changing their domiciles, lowering their salaries and subjecting them to future layoffs. While a striking pilot may be unhappy having to serve with a less senior pilot earning a higher salary, United's business justification clearly outweighs the harm to the striking pilots.

38. Plaintiff's reading of the holding in *S & W Motor Lines, Inc. v. N.L.R.B.,* 621 F.2d 598 (4th Cir.1980), is too limited. When read as a whole, *S & W Motor* actually supports United's position. The court in *S & W Motor,* although invalidating the $50 per trip bonus to nonstrikers as violative of § 8(a)(1) and § 8(a)(5) of the NLRA, noted that such a determination was "permitted but not compelled" by the earlier decision in *N.L.R.B. v. Rubatex Corp.,* 601 F.2d 147 (4th Cir.1979). In *Rubatex,* the court held that special payment to nonstrikers *after* the completion of a strike was patently and indisputably illegal, but that payments made during a strike, in some circumstances, would be proper and justifiable. *Id.* at 150. *Rubatex,* therefore, focused on when the condition was instituted, and not merely that the super-pay would remain effective after the strike. If a court determines that the super-pay was reasonably necessary at the time of its inception, such a bonus may be upheld. Therefore, the Court's decision to treat super-pay as within the realm of a "business justification" is in accordance with both *Rubatex* and *S & W Motor.*

## D. *United's Affirmative Defenses*

39. United argues that ALPA is barred from obtaining the equitable relief it seeks because of its unlawful and bad faith conduct before and during the strike. Specifically, United alleges that ALPA comes to this Court with unclean hands in three respects: first, it has insisted to impasse on permissive and illegal subjects of bargaining, thereby violating its bargaining duty under Section 2, First of the RLA; second, it has violated the RLA's *status quo* provisions by engaging in economic warfare before the end of the cooling-off period; and third, it has engaged in bad faith, coercive photographing of nonstriking employees.

**1048**

United, however, has failed to establish that any of its affirmative defenses bar APLA's claims for injunctive relief.

 40. United's first affirmative defense is that ALPA, in violation of its duty to bargain under Section 2, First, insisted to impasse over subjects relating to the Group of 500, TCAs, and the Association of Flight Attendants ("AFA"). An impasse arises only when there is a deadlock in negotiations after both sides have used their best efforts to negotiate in good faith but neither is willing to move from its position. *See, e.g., Electric Machinery Co. v. N.L.R.B.,* 653 F.2d 958, 963 (5th Cir. 1981). Moreover, both sides are under a duty to bargain to impasse over each mandatory subject of bargaining. *See, e.g., Chambers Mfg. Co.,* 124 N.L.R.B. 721 (1959), *enf'd,* 278 F.2d 715 (5th Cir.1960). United's negotiator testified, however, that at the point when United broke off negotiations, two ALPA proposals, which United concedes are mandatory subjects, were still open issues and were on the table. There was, therefore, no impasse when United broke off negotiation on May 25, 1985, because the parties had not deadlocked or bargained to impasse over the remaining mandatory issues. Moreover, ALPA sought to continue discussions, the NMB later sought to resume discussions, and United refused unless its preconditions were met. The fact that agreement was reached almost immediately after United agreed to resume talks demonstrates that there was no impasse.

41. With respect to a flight attendant back-to-work agreement, there is no evidence to support United's contention that ALPA sought to bargain over the provisions of a back-to-work agreement for flight attendants who honored ALPA's picket line. ALPA never negotiated with respect to the terms of a flight attendant agreement; its only concern was that United and AFA negotiate an agreement satisfactory to AFA. ALPA's support of those efforts was limited to taking the position that it would wait to ratify any United/ALPA agreement that might be reached until AFA reached its own agreement with United.

42. In *United States Pipe and Foundry Co. v. N.L.R.B.,* 298 F.2d 873, 877–78 (5th Cir.1962), the court held that a union's insistence during bargaining on a common expiration date for its own as well as its sister unions' contracts was not unlawful. The court reasoned that a common expiration date "vitally affects the ability of each union separately to bargain" because "each union might be able to negotiate a more advantageous new contract for the employees represented by that union." *Id.* Similarly, ALPA and AFA were supporting each other during the strike and during their separate back-to-work negotiations in a way that vitally affected the ability of each to bargain separately with United.

 43. United next argues that certain conduct by ALPA or United pilots prior to the strike was unlawful because it violated the *status quo* provisions of § 6 of the RLA. In particular, United contends that pilots took sick leave to which they were not entitled during the months prior to the strike. At trial, however, United could not identify a single pilot who took sick leave prior to the strike who was not actually sick. Moreover, § 6 of the Norris-LaGuardia Act provides that a union cannot be held responsible for the unlawful acts of its officers, members, or agents "except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106. The standard of "clear proof" requires that United prove the elements by clear and convincing evidence rather than a mere preponderance of the evidence. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 737, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218 (1966). Not only did United fail to produce "clear proof" that ALPA authorized or ratified a sickout, but it admitted that it had no evidence that ALPA was involved. Even if certain individual pilots did improperly take sick leave, therefore, ALPA cannot be held responsible.

44. United further contends that other prestrike conduct violated RLA § 6. Specifically, United points to the handbilling at a trade conference, communications to travel agents, seeking the assistance of other pilot unions to thwart United's strike replacement efforts, the boycott and photographing of the road shows, and alleged coercion or intimidation of the Group of 500 not to cross the picket line.

45. United has failed to identify any authority to support its proposition that such conduct amounts to "self help." The *status quo* provision of § 6 is designed "to prevent the union from striking and management from doing anything that would justify a strike." *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969). It is identical in "intent and effect" to the *status quo* provision in RLA § 10, which bars unilateral changes in the conditions out of which the dispute arose. *Id.* at 152, 90 S.Ct. at 300.

46. Even if the Court were to assume, as United suggests, that the Seventh Circuit's decision in *Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co.*, 310 F.2d 513 (7th Cir.1962), has been implicitly overruled, the Supreme Court has held that district courts have the power to issue injunctions notwithstanding contrary provisions of the Norris-LaGuardia Act in order "to vindicate the processes of the Railway Labor Act." *Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 41, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1957). Such a policy is necessary "to give effect to all our labor laws." *Chicago & Northwestern Ry. Co. v. United Transportation Union*, 402 U.S. 570, 573, 91 S.Ct. 1731, 1733, 29 L.Ed.2d 187 (1971). In *Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1936), the Court held that the Norris-LaGuardia Act restricts federal jurisdiction to issue injunctions "only so far as its provisions do not conflict with" those of the Railway Labor Act. *Id.* at 563, 57 S.Ct. at 607.

47. While § 8 is applicable to injunctions under the RLA, there must be an "accommodation" of the policies of the two statutes. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). Thus, in *Local 553, Transport Workers Union of America v. Eastern Air Lines, Inc.*, 695 F.2d 668, 679 (2d Cir.1983), had the union in fact refused to meet and negotiate with the carrier regarding the right of flight attendants to work on new routes, § 8 might appropriately have been held to bar enjoining the carrier from flying those routes with nonunion flight attendants. Similarly, in *Brotherhood of Railroad Trainmen v. Akron and Barberton Belt Railroad Co.*, 385 F.2d 581 (D.C.Cir.1967), the carrier had sought to enjoin a strike where it had refused to meet with the union to discuss lawful § 6 notices. These cases turn on the causal relationship between the complainant's unlawful conduct and the defendant's conduct sought to be enjoined. In these circumstances, a court's refusal to issue an injunction may force both sides to utilize the RLA dispute resolution mechanisms, and thereby effectuate the purposes of the statutory scheme.

48. Where denial of an injunction would not effectuate the purposes of the RLA, but would merely promote the economic self-interest of a party to the dispute, the appropriate accommodation of § 8 of the Norris-LaGuardia Act and the provisions of the RLA sought to be enforced is to enjoin conduct in violation of express RLA obligations. For similar reasons, equitable doctrines such as clean hands should not be applied to override the public interest in enforcing RLA obligations. Thus, in *Empresa Ecuatoriana De Aviacion v. District Lodge No. 100, supra*, 690 F.2d 838, despite the fact that the union had supported an unlawful wildcat strike, and despite the presence of strike-related violence and harassment including "misinformation that the airline had ceased operations [which] was distributed to travel

agencies" (*Id.* at 842), the court ordered reinstatement with back pay for strikers whom the employer had replaced in violation of the RLA. Referring to a similar holding in *National Airlines, Inc. v. Int'l. Assoc. of Machinists,* 430 F.2d 957 (5th Cir.1970), the court reasoned:

> In *National Airlines II* we held that wildcat strikers who had been fired while freeze provisions of the Act were in effect were entitled to reinstatement with full benefits including backpay. The wrong of the strikers was not indicated to be a bar, and in ordering a remedy we did not engage in a new balancing of striker misconduct versus employer misconduct. Again, a court must keep central to its consideration the national policies underlying the Railway Labor Act and not individual feelings of judges about who has and who has not behaved badly.

*Empresa, supra,* 690 F.2d at 847. The case for disregarding misconduct in favor of enforcing the RLA is even stronger in the present case. The misconduct does not involve any violence, United has not demonstrated any economic injury, and the individuals adversely affected by United's policies with respect to the Group of 500 and the system rebid would suffer substantial and irreparable injury if no injunction is issued.

■ 49. Furthermore, United has failed to demonstrate that the doctrine of unclean hands even applies in this case. The court in *International Union v. Local Union No. 589,* 693 F.2d 666 (7th Cir.1982), stated that "the clean hands doctrine only applies where there is a direct nexus between the bad conduct and the activities sought to be enjoined." *Id.* at 672. The conduct which ALPA seeks to enjoin had its genesis long before any ALPA conduct that took place during and after the strike. United has never asserted, and has offered no evidence to support its contention, that the prestrike conduct on which it relies in any way affected its policies with respect

to the Group of 500, super-seniority or super-pay. Similarly, there is no evidence that any prestrike ALPA conduct affected the outcome of the negotiations, the failure to reach an agreement before May 17, 1985, the UAL–MEC's decision to strike, or the course of negotiations after May 16, 1985. Moreover, United has failed to demonstrate that it was injured in any way by the purported misconduct. In short, ALPA's purported "bad conduct" has no nexus with the conduct ALPA seeks to enjoin and therefore cannot be grounds for denial of equitable relief.

■ 50. ALPA has satisfied the standards for a permanent injunction. United's continuing violations of the Railway Labor Act plainly constitute irreparable injury to ALPA for which there is no remedy at law. The Supreme Court has repeatedly recognized that the judiciary has broad injunctive powers to enforce the obligations of the Railway Labor Act:

> More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern.... Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.

*Virginian Railway Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937).

51. To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, it is hereby ordered that:

1. The Court declares that United's policies of denying employment and accrued seniority to the Group of 500 pilots and of conducting and attempting to implement the strike-related rebid of pilot positions violate the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.*

2. The Court declares that United's policy of paying to fleet-qualified permanent replacement captains and second officers rates of $75,000 and $50,000 per year, respectively, does not violate the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.*

3. Judgment is entered in favor of plaintiff and against defendant on plaintiff's claims regarding the Group of 500 pilots and the strike-related rebid of pilot positions.

4. Judgment is entered in favor of defendant and against plaintiff on plaintiff's claim regarding rates of pay for fleet-qualified permanent replacements.

5. Defendant, its officers, agents and employees are hereby:

(a) directed and enjoined to restore the "Group of 500" pilots who elected to respect ALPA picket lines to the status of employees, and to assign them immediately to line pilot service if they completed their training, and otherwise permit them to complete their training without discrimination, and then enter line service, with seniority in all cases accrued from May 17, 1985;

(b) restrained and enjoined from implementing bid awards made to pilots during the pilot strike, or from in any other way preferring nonstrikers for any vacancies that have arisen since the end of the strike or will arise in the future.

6. Pursuant to Fed.R.Civ.P. 52(b), the Court reserves the right to amend the above findings and conclusions or make additional findings and conclusions upon motion of either party made no later than ten days from today and the Court may amend the judgment accordingly.

IT IS SO ORDERED.